## STATE v. FLANDERS.

The second section of the act of June 25, 1858, in amendment of the act of June 27, 1857, making parties witnesses, does not extend the provisions of the latter act to criminal proceedings, and upon the trial of an indictment the respondent cannot be permitted to testify.

When a general objection is taken to testimony, without a statement of the ground of the objection, it is to be understood as an objection to its competency, and not as one taken upon some ground which might have been obviated at the trial.

When a witness states that he has an impression as to the matter of inquiry, it is competent evidence if he means that he has some recollection, however slight, founded on his personal knowledge; and whether such is his meaning is to be determined by the jury, unless it is apparent to the court, from the subject of his testimony and his other statements in connection with it, that he does not intend so to be understood.

It is not forgery to procure the assent of the signer of a bond to a material alteration, made without his authority, after he had executed it, by falsely and fraudulently representing to him that a state of facts existed which would render the alteration of no importance to him, although at the time of giving the assent he qualified it by saying that he assented on condition that the representations were true.

INDICTMENT, charging the respondent with the crime of forgery, in having altered, at Manchester, in said county, on the fourth day of August, 1857, a bond of that date, in the penal sum of forty thousand dollars, signed by himself as principal, and by Samuel Andrews and Luther Aiken as sureties, given and payable to Thomas P. Webber. The bond was originally written with a condition to indemnify Webber against the attachments made by Asa T. Barron, or by his procurement, on a house at the corner of Union and Concord streets, in Manchester, which the respondent had bargained to sell to Webber for about the sum of $6000. The alteration, whereby the forgery was charged to have been committed, consisted in adding to the condition of the bond, after the provision to save

Webber harmless from the attachments on the house made by Barron, or his procurement, the words, "*or from any and every claim whatsoever.*" It was admitted that at the date of the bond there were subsisting valid attachments on the house other than those made by Barron or his procurement, to a very large amount, made in suits on debts then due and owing from the respondent, and that the alteration in the bond was material. It was also admitted that the respondent altered the bond in this material manner, after it was signed by Andrews, without authority first obtained from him.

The principal questions before the jury were, whether the signature of Aiken was upon the bond when the respondent made the alteration ; the evidence being clear that Aiken never saw the bond before it was passed to Webber, except when he signed it, and never assented to any alteration afterwards, and whether Andrews assented to the alteration after it was made and before the respondent passed or attempted to pass the bond to Webber as genuine.

Upon the first question Webber testified positively that Aiken's signature was upon the bond before the alteration was made. Aiken testified that he read the bond hastily when he signed it, and could not say whether it had then been altered or not, although he had an impression in regard to it. The court thereupon permitted the counsel for the government to ask him, against the respondent's objection, what his impression was, and he testified that his impression was that it had not then been altered, but contained an indemnity against the Barron attachment only as originally written.

Upon the second question, there was positive evidence, without any conflict, that Andrews had no knowledge of the alteration until after the respondent had offered and passed the bond to Webber as genuine, and it had subsequently been brought to him by Webber for examination.

The respondent, however, insisting that the jury might find that he had not passed the bond to Webber until after Webber brought it to Andrews, the court permitted him to introduce evidence tending to show that after the respondent had delivered the bond to Webber, and Webber had carried it to Andrews, in an interview which subsequently took place between the respondent, Andrews and Webber, Andrews yielded a qualified assent to the alteration, dependent on the truth of the respondent's representation, then and there made, as to the existence, validity and amount of attachments then existing upon the house bargained to Webber, other than those made by Barron, or his procurement, and instructed the jury that if, as was admitted, Andrews signed the bond before the alteration, and the alteration was made without his authority, there must have been an unqualified assent by him to the alteration before the respondent passed or offered to pass the bond to Webber as genuine; or, if he gave a qualified assent to the alteration, dependent on the correctness of the representation made by the respondent at the time in relation to the attachments indemnified against by the alteration, and they found from the evidence that this representation was true, such qualified assent would be sufficient; but, if they found from the evidence that this representation was false and fraudulent, such qualified assent thus obtained would not bind Andrews, and might be disregarded in their consideration of the case.

In the course of his cross-examination Webber stated that at or about a certain time he placed the bond alleged to be forged in the hands of Asa T. Barron. The counsel for the respondent, thereupon, for the purpose of testing his feelings and honesty as a witness, proposed to ask him whether at or about that time Barron signed notes with him as surety, and whether he was then himself bankrupt. The counsel for the government objecting, the court excluded the testimony proposed.

In remarking upon the testimony of Aiken as to whether or not the bond had been altered when he signed it, the court suggested to the jury that perhaps they might think the large amount of the bond a circumstance deserving consideration, in connection with all the other facts and circumstances of the case, in determining whether or not Aiken would be likely to notice and remember, from hastily reading it, whether the bond, when he signed it, went to indemnify Webber against the Barron attachments only upon the house, or against those and a very large amount of other attachments thereon, admitted to have existed for debts then due from the respondent.

At the close of the evidence, the respondent offered himself as a witness in his own behalf, but the court declined to admit him to testify. The jury having returned a verdict of guilty, the respondent moved that the same be set aside and a new trial granted, for supposed error in the foregoing suggestion, rulings and instructions of the court.

*Joel Parker*, (of Massachusetts), for the respondent.

1. The evidence of Aiken respecting his impression was inadmissible. *Clark* v. *Bigelow*, 4 Shep. 246; *Carmatt* v. *Post*, 8 Watts 411; *Hoitt* v. *Moulton*, 21 N. H. (1 Fost.) 586, and cases cited, though they are distinguishable from this case; McNally's Ev. 262; 1 Greenl. Ev., sec. 440.

2. The instructions of the court, that if the jury found the representations false and fraudulent, the qualified assent of Andrews would not bind Andrews, and might be disregarded in the consideration of the case, were erroneous. The falsity in the character of the instrument, which is essential to forgery, was removed by the assent, though procured by false and fraudulent means.

3. The terms of the act of June 25, 1858, extending the provisions of the act of June 27, 1857, to all causes, are sufficiently broad to include indictments. The defendant should have been permitted to testify.

State *v.* Flanders.

*A. F. Stevens*, (Solicitor for Hillsborough county), for the State.

1. The testimony of Aiken, as to his impression, was properly admitted. 1 Greenl. Ev., sec. 440; *Hoitt* v. *Moulton*, 21 N. H. (1 Fost.) 586.

2. The admission of the evidence relative to the qualified assent of Andrews, was a concession to which the respondent was not in law entitled. The restrictions accompanying its admission, and the instructions given to the jury in that connection, could therefore work no injury to the respondent of which he has the right to complain. If, however, the evidence as to the assent was competent, still it was not in fact proof of a ratification of the altered bond, as the assent was declared to depend upon the truth of the representations, and they were found by the jury to be false and fraudulent.

3. The respondent was properly excluded as a witness. The intention of the Legislature in the acts of June 27, 1857, and June 25, 1858, manifestly was to confine these provisions to civil causes.

SAWYER, J. The defendant was offered as a witness to testify under the provisions of the act of June 25, 1858, in amendment of the act of June 27, 1857, entitled "An act relating to the competency of witnesses." The original act provides that no person shall be excused or excluded as a witness, in any civil suit, by reason of his interest as a party, but expressly excepts from its operation the cases of attestation of wills, &c., suits pending at the passage of the act, and suits in which one of the parties is executor or administrator, and he does not consent that his adversary shall testify. The amendatory act provides, section one, for taking the deposition of a party, with a proviso that he shall not be required to answer any question or produce any document, the answering or producing of which may tend to criminate himself; and section two

declares that the provisions of the original act shall extend and be applied to all actions, suits, and proceedings at law or in equity, with the same proviso, however, as to the cases of attestation of wills, &c., and substantially the same as to suits in which one of the parties is executor or administrator, as in the original act, but omitting the exception as to suits pending at the passage of the original act. The question is whether, by the broad and comprehensive terms of section two of the amendatory act, that the provisions of the former act shall extend and be applied to all suits and proceedings at law and in equity, the legislature intended to include indictments and other criminal proceedings. We think it clear that it was not so intended, but that the object of this provision of section two is merely to declare the intention of the legislature to extend the operation of the original act to all civil suits, whether they were pending at the passage of that act or not.

The mere omission of the exception as to pending suits might not of itself be sufficient to give to the statute this intended application, under the well settled rule of construction, that a new enactment is not to be construed as applying to pending causes, unless it is so declared, or it is clearly to be inferred from the nature of its provisions that it was intended so to be applied. All the other provisions of both acts have reference to civil causes, and not to criminal proceedings; and as the terms in which this is expressed are fully satisfied by the construction that this also refers to such causes, it is no sufficient ground for construing it as including indictments and other criminal proceedings merely because they are broad and comprehensive enough to include them, and might, therefore, be so construed, if, from the context, it appeared that such was the intention. Looking to the other provisions of the act, there is nothing to indicate that this was the intention. The provision in section one, that in taking the deposition of a party he shall not be required to answer

State *v.* Flanders.

any question tending to criminate himself, is not to be reconciled with an intention to enact in the next section a provision subjecting him to examination as a witness for the government; or, if voluntarily testifying in the defence, to cross-examination upon the question of his criminality in a proceeding instituted for the purpose of testing his guilt or innocence. If the legislature had intended to enact so great a change of the law, it must be supposed they would have declared it by an explicit and direct enactment, that the provisions of the original act should extend and be applied to all criminal as well as civil proceedings. Instead of this, the enactment is expressed in terms which, though sufficiently broad and comprehensive to include indictments, if, from its other provisions, the object appeared to be such as to render that construction necessary, are nevertheless made significant and operative by giving them the more limited application to civil causes pending, and so construed more in accordance with the spirit and policy of the acts, as gathered from their other provisions.

If, however, it had been explicitly declared that the enactment was to include criminal as well as civil proceedings, it admits of question whether, by any judicial interpretation, it could be made to have any practical operation without infringing the 15th article in the Bill of Rights, which declares that no person held to answer for any crime or offence shall be compelled to furnish evidence against himself. The provisions of the original act, which upon the construction contended for by the respondent are by the amendatory act extended and made applicable to indictments, are that "no person shall be excused as a witness," &c., that is, exonerated or relieved from obligation to testify when called by the adverse party, or "excluded as a witness," &c., that is, rejected when he offers himself to testify in his own favor. Upon that construction, the legislature have enacted not only that the respondent in

an indictment may voluntarily testify in support of his defence, but that he may be compelled to testify at the instance of the government in support of the indictment against himself. So far as the enactment may be construed as undertaking thus to compel him to testify, it would seem very clearly to be in direct contravention of the Bill of Rights. If the view should be taken that, though inoperative in that provision, it might have effect and operation in the other, which permits him to testify voluntarily, the same objection would arise upon subjecting him to cross-examination. To obviate this it would be necessary to hold, either that the enactment could have no further operation and effect than to permit him to testify, so far as he might choose to make himself a witness—thus leaving it optional with·him whether to submit to cross-examination or not—or that, by volunteering to testify, he had waived the benefit of the constitutional provision, and might therefore be compelled to make full disclosure. In either view the effect must necessarily be to drive him if guilty, to testify to the full confession of his guilt, or to make the confession in another form, by refraining from testifying or declining to submit to cross-examination, when, according to every principle of reason, and to all experience of human conduct, this could be accounted for upon no other hypothesis than that of his guilt. An enactment which should introduce this as the state of the law in reference to criminal trials, would seem to place the accused in every instance in a position where he must necessarily furnish evidence against himself, unless it be assumed at the threshold that he is innocent, and may therefore safely submit to the test of a cross-examination. But every sound principle recognized in the administration of criminal law, no less than this express prohibition in the Bill of Rights, secures to him who may be assumed to be guilty, the same advantages from the course of the trial and from the rules of evidence, as are to be enjoyed

by him who may be supposed to be innocent. The very necessity which arises for making the distinction at the outset, as to the guilt or innocence of the party accused, in order to relieve such an enactment from the condemnation of the article in the Bill of Rights, demonstrates the proposition that it would fall within its prohibition.

It is not necessary, however, to place the decision upon this ground. The views which have been presented in discussing it furnish additional considerations in support of the conclusion that the legislature did not intend to include criminal proceedings, and on that ground the decision is to be understood as placed.

Another question in the case is, whether the testimony of Aiken, as to his impression, was properly received. He testified that he read the bond hastily when he signed it, and could not say whether it had then been altered or not, but that he had an impression in regard to it. The government then asked what the impression was, to which the respondent objected. The objection has several aspects. An impression as to a past fact may mean personal knowledge of the fact as it rests in the memory, though the remembrance is so faint that it cannot be characterized as an undoubting recollection, and is therefore spoken of as an impression. This, perhaps, is the sense in which the word is most commonly used by witnesses, in giving their testimony. In this sense the impression of a witness is evidence, however indistinct and unreliable the recollection may be. No line can be drawn for the exclusion of any record left upon the memory, as the impress of personal knowledge, because of the dimness of the inscription. If, therefore, the objection is to be considered as one taken to the general competency of such testimony, it is clear that it was properly overruled. An impression, however, may mean an understanding or belief of the fact, derived from some other source than personal observation, as the information of others; or it

State *v.* Flanders.

may mean an inference or conclusion of the mind as to the existence of the fact, drawn from a knowledge of other facts. When used in these senses, it is not evidence; and the objection may be understood to be that enough appears in the other statements of the witness, when considered in connection with the subject of his testimony, to show that he intended to use the word in one of these senses as his understanding and belief, or his inference and conclusion, and not as his recollection. It has been urged in the argument, that when the witness stated that he read the bond hastily, and could not say whether it had then been altered or not, he was fairly to be understood as meaning that he had no such recollection, founded on his personal observation, as would enable him to testify from memory; and that, consequently, by the word impression, he must have meant an understanding or inference, resulting from the information of others, or the operations of his own mind, instead of his personal knowledge of the fact. If it was apparent to the court that the word was thus used, the objection is well taken. We think, however, that, taking the whole testimony together, it may be understood to mean that, although, from the slight attention which he gave to the bond in his hasty reading, he cannot say positively whether the alteration had been made or not, he nevertheless had an impression upon his memory, derived from reading it, that it had not. At least, it may be said that the jury might so understand him, without doing violence to any fact or statement contained in his testimony. If it was susceptible of that construction, it could not be excluded by the court merely because a different interpretation might be put upon it, which would render it incompetent. If the parties choose to leave the testimony of a witness doubtful, by refraining to draw from him an explicit declaration of his meaning, when it is susceptible of two interpretations, one of which renders it competent and the other incompetent, it must

be submitted to the jury, with proper instructions, of course, as to how they are to regard it, when they have ascertained what his meaning really was.

In another view, the objection might have been sustained, if it had appeared in the case that the objection was placed on that ground at the trial. When the witness stated that he could not say whether the bond had been altered or not, it might well be doubted how he intended to be understood in the subsequent statement that he had an impression in regard to it. If the respondent had objected that the witness should not be asked the question what his impression was, until it had first been ascertained whether he meant by the word impression, a recollection or not, the objection would have been sustained. It cannot be understood to have been made on that ground. It is stated as a general objection, and, as such, must be understood as taken to the competency of the evidence, and not to the form of the question or other incidental matter, which, if stated at the trial, would have given the counsel for the government an opportunity to obviate it.

Another material question arises upon the instructions to the jury, relative to the assent given by Andrews to the alteration of the bond after it had been executed by him. It must be understood that the jury may have found, upon the evidence, that, down to the time of the assent, the offence charged had not been committed. The case states, it is true, that before this, Andrews had signed the bond, and afterwards, and before the assent, the respondent made the alteration, and that the evidence was positive and uncontradicted that he, subsequently and before the assent, delivered the bond to Webber as genuine, without the knowledge of Andrews that it had been altered. But the court cannot, therefore, hold that the verdict must have been rendered upon the ground that the bond was passed or offered to Webber before the assent; or, if so, that the criminal intent was found by

the jury upon that evidence. They may have believed that the respondent did not pass or offer the bond to Webber unconditionally, as binding the obligors to him from that time in every event. They may have believed that the respondent, intending to procure the assent of Andrews, placed it in Webber's hands, to be kept by him till then, and then to become his, and take effect as their bond. Notwithstanding the positive and uncontradicted character of the testimony as to the delivery, they may have discredited it entirely, or so far as to entertain reasonable doubts of the fact of delivery, or of the understanding and intention of the respondent in making it. The jury, therefore, may have acquitted the respondent upon any state of facts shown to exist prior to the assent, and convicted him upon the case as presented by the evidence and the instructions of the court upon it in reference to the assent.

Were the instructions correct? They are in effect that, if Andrews qualified his assent by making it to depend upon the truth of the respondent's representations, and the representations turned out to be false and fraudulent, this would be sufficient, without other proof of criminal intent, to render the unauthorized alteration of the bond a forgery. The jury were told, in substance, that, if the respondent induced Andrews to consent to the delivery of the bond as his, after it had been so altered, by means of false and fraudulent representations, this of itself would be sufficient to warrant a conviction. This is not said in terms in the instructions, as reported in the case, but such is their obvious meaning, and so they must have been understood by the jury.

Forgery consists in falsely making or altering a writing, with intent to defraud. The essence of the crime is contained in the union of the two elements—that the instrument is a fiction, and that it is a fiction prepared for a fraudulent purpose. The false character of the instru-

ment, independent of the fraudulent purpose for which it is prepared, may consist in the application of a false signature—that is, one which is not that of the party whose signature it purports to be—to any instrument, whether genuine or false ; or, as is claimed in this case, in the application of a genuine signature to an instrument which is false—that is, which is not in fact the instrument to which the party applied his signature. In both cases the falsity in the character of the paper disappears when it is shown that the application of the genuine signature in the one case, and the false one in the other, was made by the consent and authority of the party at the time of making it, or was assented to and ratified by him afterwards ; and it can make no difference in the latter case more than in the former, that his assent was procured by means of false and fraudulent representations. If a party is induced by such representations to authorize another to sign his name to a specified paper, there is no more falsity in the signature, or the application of it to that paper, than if, induced by such representations, he had signed it himself; and it is equally so in the case of a subsequent assent, procured by such means to an unauthorized signature, or to the application of a genuine signature to an instrument to which it was not originally affixed. In every such case the assent of the party, voluntarily given, though procured through falsehood and fraud, removes the false character which without it might be imputed to the instrument. The fraud may exonerate the party from liability upon it as a contract, and under some circumstances may, in itself, constitute an offence subjecting the party to indictment ; but, because false means are employed to procure the consent to the instrument, the instrument itself cannot for that reason be deemed false. I have found no authorities upon the point except the cases of *Rex* v. *Chadwick*, 2 Mood. & Rob. 545, and *Rex* v. *Collins*, id. 461. Although they are merely *nisi prius* rulings, they are cited by

State *v.* Flanders.

Roscoe, in his treatise on criminal evidence, as establishing the law in accordance with the views here suggested. The rulings were, that it is not forgery to induce a party to execute an instrument by a fraudulent misrepresentation of its contents, or to procure. the signature by fraud to a document which had been altered without the party's knowledge.

The jury should have been instructed that, upon the facts admitted in reference to the signature of Andrews before the alteration of the bond, and the making of it by the respondent without his authority at the time, if the respondent subsequently procured his assent to the alteration before delivering the bond to Webber, the respondent should be acquitted, unless, upon other evidence in the case, they found the existence of the fraudulent intent prior to the time of procuring the assent. For this cause a new trial must be granted. The other questions presented by the case may not be material on the new trial, and have not, therefore, been considered.

*Verdict set aside, and new trial granted.*