**HOFFER et ux. v. CRAWFORD et al.**

No. 7448.

Supreme Court of North Dakota.

Aug. 20, 1954.

Cox, Cox, Pearce & Engebretson, Bismarck, for appellants.

Lanier, Lanier & Knox, Fargo, for respondents.

JOHNSON, Judge.

On May 28, 1952, the plaintiffs commenced an action against the defendants to determine adverse claims and quiet title to 720 acres described as: "Section 34–138–69 and the SW¼NW¼, Lot 4, Section 2–137–69." The actual purpose of the action is to set aside and have declared void a mineral deed given by the plaintiffs to defendant D. W. Crawford to an undivided one-fourth interest in and to all of the oil, gas and other minerals in and under the above described land and that may be produced therefrom.

The transaction resulting in the mineral deed to D. W. Crawford took place at the farm of the plaintiffs on May 18, 1950. On the same day the plaintiffs executed a gas, oil and mineral lease to B. E. Winder of Fort Worth, Texas, and another mineral deed to D. W. Crawford covering one-half of the oil, gas and other minerals in and under and produced from the following described land: SE¼NE¼, Lot 1, Section 2–137–69. The oil, gas, and mineral lease

and the mineral deed covering the eighty acres are not involved in this action.

The defendants are the grantees of the minerals obtained by the defendant D. W. Crawford, or James H. White and W. C. Duncan, who purchased a part of the minerals granted to D. W. Crawford and in turn sold them to the other parties. The plaintiffs claim that the mineral deed for the 720 acres was obtained by fraud. D. W. Crawford answers and denies the allegation of fraud and states that he obtained the mineral deed for value; that thereafter he transferred a ⅛ interest to James H. White and W. C. Duncan, a ⅛ interest to John R. Bowker and a 1/36 interest to R. C. Moss. The other defendants answer that they are innocent bona fide purchasers for value.

The case was tried to the court and resulted in judgment for the plaintiffs. The defendants appealed and demanded a trial de novo.

There are two issues for determination. The first and primary issue, is whether or not the mineral deed covering the 720 acres was obtained from the plaintiffs by fraud and misrepresentation so as to render it void, and second, whether or not John R. Bowker, R. C. Moss, and James H. White and W. C. Duncan and their grantees are innocent purchasers for value, and take the minerals deeded to them free from fraud, if any was involved.

The plaintiffs purchased the 720 acres involved in this action from the Federal Land Bank of St. Paul. It had reserved fifty per cent of all oil, gas and minerals in and under said land. The plaintiffs owned the other fifty per cent. The plaintiffs owned one hundred per cent of the minerals in and under the 80 acre tract which is not involved in this action.

D. W. Crawford of Gainesville, Texas, was in the business of obtaining oil, gas and mineral leases and buying minerals. He was assisted in his operations by his two sons, D. B. Crawford and P. E. Crawford. On May 18, 1950, Robert Mayer, a neighbor, introduced these two men to the plaintiffs. As a result of the meeting between these men and the plaintiffs, the oil, gas and mineral lease and the two mineral deeds were executed to D. W. Crawford.

The oil, gas and mineral lease and the two mineral deeds given by the plaintiffs to D. W. Crawford were filed for record in Stutsman County on the 23rd day of May, 1950.

After acquiring one-fourth of the minerals in the 720 acre tract from the plaintiffs, D. W. Crawford, on May 23, 1950, made, executed and delivered a mineral deed to John R. Bowker for an undivided ⅛ interest in and to all of the oil, gas and minerals in said tract. On June 1, 1950, D. W. Crawford made, executed and delivered a mineral deed to an undivided 1/36 interest covering the same tract of land to R. C. Moss. On June 2, 1950, D. W. Crawford made, executed and delivered a mineral deed covering an undivided ⅛ interest in and under the same property to James H. White and W. C. Duncan. All these mineral deeds were filed for record in Stutsman County a few days after they were executed and delivered.

It thus appears that by June 2, 1950, D. W. Crawford had conveyed his entire one-fourth interest of the oil, gas and other minerals that he had obtained from the plaintiffs.

The evidence discloses that D. W. Crawford did not buy these minerals as an agent for any of the parties defendant. He was buying them for himself.

On July 11, 1950, James H. White and W. C. Duncan made and executed a mineral deed covering an undivided 1/108 interest in and to all the oil, gas and other minerals in and under the land covered by the original mineral deed from the plaintiffs to D. W. Crawford, to C. W. Cahoon; on August the 2nd, 1950, they executed a deed to 1/108 interest in the minerals covering the same property to E. M. Solow; on August 8, they executed another mineral deed to an undivided 1/216 interest in the same prop-

erty to J. F. Hyman; and on June 25, 1951, they executed a mineral deed to an undivided $\frac{19}{216}$ interest covering the same property to Eloise Munson.

By June 25, 1951, White and Duncan had conveyed all the minerals that they had obtained from D. W. Crawford. These deeds were all filed and recorded in Stutsman County prior to the institution of this action.

It is admitted that the plaintiffs did not appear before a notary public. The mineral deed covering the 720 acre tract was notarized by John L. Graf, a notary public at Streeter, North Dakota. He is a banker and knew the signatures of the plaintiffs and attached his acknowledgment to the mineral deed. The certificate of acknowledgment is in proper form.

 The home of the plaintiffs is located on the SE¼, Section 34–138–69. It has been their homestead since 1941. It is conceded by the appellants that the mineral deed describing the 720 acres obtained by D. W. Crawford is not effective as to the homestead property. NDRC 1943, 47–1805; Dixon v. Kaufman, N.D., 58 N.W.2d 797. The mineral deed to the homestead was void. No title to the minerals in or under the homestead passed to D. W. Crawford or any of his grantees or the grantees of his grantees.

 Assuming that fraud was involved in the procurement of the mineral deed by D. W. Crawford, the question for determination is whether or not the mineral deed covering the balance of the property vested title in the grantees of D. W. Crawford and the grantees of his grantees as innocent purchasers for value without notice. For a determination of that question it is necessary to examine the facts closely to ascertain whether the original mineral deed to D. W. Crawford was executed under such circumstances as to make it void or merely voidable.

The main dispute on the facts centers around the claim of the plaintiffs that at the time of their talk with the Crawford brothers no mention was made of a mineral deed. There is also a conflict in the testimony as to the manner in which the lease and two mineral deeds were executed.

The facts disclose some discussion as to the mineral interests of the plaintiffs in the land as the Crawfords ascertained that they owned one-half of the minerals in the 720 acre tract acquired from the Federal Land Bank and one hundred per cent of the minerals in the 80 acre tract acquired by them from another source. The lease covers 800 acres.

The plaintiffs assert that the Crawfords offered 25¢ an acre for an oil, gas and mineral lease. The Crawfords contend that they offered 25¢ per acre for an oil and gas lease and one-half of the minerals owned by the plaintiffs. The evidence discloses that Robert Mayer, who introduced the Crawfords to these plaintiffs, had entered into an oil, gas and mineral lease with D. W. Crawford, and had sold him one-half of his minerals. Mr. Graf, the notary, had also executed an oil, gas and mineral lease and sold minerals in a 960 acre tract at the same price. The evidence does not disclose that the plaintiffs knew of these transactions with Mayer or Graf. They are merely mentioned for the purpose of showing that other persons had entered into similar transactions as the plaintiffs.

Both the plaintiffs testified that D. B. Crawford and they were the only persons present at the time of the execution of the oil, gas and mineral lease and the two mineral deeds. They did not remember that they had executed three instruments. They contended that the instruments stuck together; that they signed the oil, gas and mineral lease which was on top at a table in their home; that after Jacob Hoffer had signed the instrument Mr. Crawford pushed up the top instrument so that they could see where they were to sign the other instrument underneath it. Mr. Hoffer signed first and his wife immediately afterwards.

They claim that they thought the bottom instrument was a copy of the top one and state that they asked for a copy. They do not claim that the bottom instrument was represented to them as being the same as the top one. D. B. Crawford states that he does not remember that they asked for a copy of the instrument. D. B. Crawford testifies that he separated the three instruments, laid them on the table, showed them to the plaintiffs, and explained them.

Mrs. Hoffer was asked on cross examination the following question: "Q. When the paper was pushed up and you signed the one underneath, did it look to you exactly like the one on top? A. Well, I wouldn't say it looked exactly like it." The evidence discloses that neither of the plaintiffs attempted to look at the instrument underneath. Neither of the parties attempted to push up the top instrument much further than was necessary to sign the bottom one. The plaintiffs think there were only two instruments, but the evidence shows that there were actually three. Neither of the plaintiffs picked up the instruments nor did they attempt to examine them.

Neither are the plaintiffs able to explain how the instruments stuck together. They did not examine them closely enough to determine whether they were stapled or clipped together. However, they insist that they stuck together. This is denied by D. B. Crawford.

The plaintiffs had never met the Crawford brothers until May 18, 1950. They were dealing with complete strangers. After the oil, gas and mineral lease and the two mineral deeds had been signed by the plaintiffs they received a check drawn on D. W. Crawford for $110 as a consideration for the oil and gas lease and the two mineral deeds. The check is dated May 19, 1950, and is drawn in favor of Jacob F. Hoffer, on D. W. Crawford, signed by Philip Crawford and payable at the First State Bank of Gainesville, Texas. In the upper left hand corner of the check appears, "leases and ½ Mineral North of Streeter, N. D." It is contended by the plaintiffs that this notation was not on the check when it was delivered. The Crawfords drew the check and claim that this notation was on it when it was delivered to Jacob Hoffer. The check is typewritten except for the signature and ordinary examination thereof would indicate that the entire check including the notation was written on the same typewriter. The check was cashed May 27, 1950, by Jacob Hoffer.

It will be noted that the oil and gas lease is dated May 18, 1950, and the two mineral deeds and the check are dated May 19, 1950. There is no question that all these documents were executed on the same date. On cross examination Mr. D. B. Crawford was asked to explain this. He was asked: "Q. Now, will you tell me how you account for the fact that you were only out there once and the lease is dated under their signature the 18th, and the deed is dated on the 19th, a date which you never saw them? A. The lease was supposed to be dated ahead of the mineral deed." He was further asked: "Q. Why is the lease supposed to be dated a date earlier than the deed? A. Because the mineral is subject to the lease."

From this testimony it would appear that the Crawfords dated these instruments as they did for the reason that they were under the impression that the oil lease would have to be dated ahead of the mineral deed in order that the mineral deed be subject to the lease.

Under all the facts and circumstances involved in the transaction resulting in the oil, gas and mineral lease and the two mineral deeds signed by the plaintiffs on May 18, 1950, there is some question whether any fraud was involved.

"In any event, fraud is not to be lightly inferred or to be inferred from slight presumptions.

"It follows from the rule that fraud will not be presumed that the burden of proving fraud rests on the party who relies on it either for the purpose of attack or defense.

"The rules which impose the burden of proof on one alleging fraud and which deny a presumption of fraud rest on the fact that fraud is regarded as criminal in its essence, and involves moral turpitude at least, while, on the other hand, the presumption is that all men are honest, that individuals deal fairly and honestly, that private transactions are fair and regular, and that participants act in honesty and good faith. The presumption is against the existence of fraud and in favor of innocence, the presumption against fraud approximating in strength the presumption of innocence of crime. Where a transaction is capable of two constructions, one of which is honest and the other is fraudulent, or where the facts are equally consistent with honesty and with fraud, fraud will not be presumed and the transaction should be held honest." 37 C.J.S., Fraud, § 94, pages 397–400.

"The law presumes that all men are fair and honest, that their dealings are in good faith, and without intention to disturb, cheat, hinder, delay, or defraud others; where a transaction called in question is equally capable of two constructions—one that is fair and honest and one that is dishonest—then the law is that the fair and honest construction must prevail, and the transaction called in question must be presumed to be fair and honest." Krause v. Krause, 30 N.D. 54, 63, 151 N.W. 991, 994.

See, also, Union Bank of Dunn Center v. Hackett-Gates-Hurty Co., 62 N.D. 549, 243 N.W. 926.

There is a presumption that private transactions have been fair and regular. NDRC 1943, 31–1103, subd. 19.

■ However, the trial court saw and heard the witnesses and came to the conclusion that fraud was involved. Its finding is entitled to appreciable weight. It does not follow, however, that such fraud vitiates and voids the mineral deed to D. W. Crawford so as to prevent innocent purchasers for value from acquiring title to the minerals granted to them by him or granted to them by his grantees free from such fraud.

The plaintiffs are intelligent people; they have had considerable experience in business affairs; they operate a fairly large farm; they read and write english; they had an opportunity to examine and thoroughly check the instruments before signing them. They thought they had signed only two documents whereas they actually signed three. If their belief that the second instrument was their copy of the top one was justified, and that is what they claim they thought, the signature of a third instrument should have been sufficient to at least put them on inquiry as to its nature. They knew the difference between an oil, gas and mineral lease and a mineral deed. Mrs. Hoffer knew that they did not look alike. Neither of the plaintiffs picked up the instruments to examine them nor did they look at the instruments underneath the oil, gas and mineral lease. They did not attempt to ascertain how the instruments stuck together. They did examine a blank oil, gas and mineral lease prior to the execution of the lease and the mineral deed. They merely assumed that the instruments were the same, if their version of the facts is to be considered in its most favorable light. The testimony of D. B. Crawford is that he laid the documents on the table, separated them and told them what they were.

■ Considering all the facts and circumstances and all the evidence; that these parties were dealing with complete strangers; that there was no confidential relationship between them and the Crawfords; and that there is a serious question whether the plaintiffs, by preponderance of the evidence, have presented facts which overcome the presumption of honest and fair dealing, we have come to the conclusion that the mineral deed executed by the plaintiffs to D. W. Crawford covering an un-

divided one-fourth interest in and to all the oil, gas and other minerals in and under the 720 acres purchased by them from the Federal Land Bank, was merely voidable and not void.

■ "A deed that is absolutely void passes no title. It gives no constructive notice and a claim of bona fides may not be based upon a void instrument, even when placed of record in the manner prescribed by statute. 45 Am. Jur., Records and Recording Laws, Section 106; 26 C.J.S., Deeds, § 68." Dixon v. Kaufman, N.D., 58 N.W.2d 797, 805.

■ A deed obtained by fraud is sometimes void, but more often is merely voidable, depending on the facts on which the claim of fraud is based. 55 Am.Jur., Vendor and Purchaser, Sec. 666 and 667; 16 Am.Jur., Sec. 35; 45 Am.Jur., Sec. 106; 26 C.J.S., Deeds, § 68b.

"Uniformity does not prevail among the courts as to the circumstances of fraud which will render a deed void and inoperative as against the claims of an innocent purchaser. It would seem, however, that in such cases the innocent purchaser should be protected unless the fraud is *clear, unequivocal, and its force undiminished by lack of care on the part of a mentally competent, defrauded grantor.*" Dixon v. Kaufman, 58 N.W.2d at page 805. (Emphasis supplied.)

The facts here indicate that the plaintiffs as literate people of normal mentality and maturity, dealing with a complete stranger did not exercise that care and caution which would be normal under all of the circumstances. If we accept their version of what happened at the time the mineral deed was executed, a fraud was perpetrated upon them. The act, however, of the plaintiffs in signing the mineral deed now involves innocent purchasers who have paid valuable consideration for mineral deeds based on the original mineral deed executed by the plaintiffs.

"When one of two innocent persons must suffer by the act of a third, he by whose negligence it happened must be the sufferer." NDRC 1943, 31–1105, subd. 34.

■ "If a loss results to parties ignorant and innocent of the fraud, it must fall on those whose lack of care and attention made the fraud possible rather than upon those who were wholly unconnected with the fraudulent transaction. If the plaintiffs, or either of them, had read or even looked at the mineral deed before they signed it, they would have known what they were signing. The words 'mineral deed' in black capital letters three-eighths of an inch high appear on the face of the instrument and also on the back. Not only did they fail to read before they signed, but they did not read the mineral deed until some two weeks later. Their misplaced confidence in Larson resulted in a loss for which they must bear responsibility as against bona fide purchasers with respect to their nonhomestead lands. Pure Oil Co. v. Swindall, Tex.Com.App., 58 S.W.2d 7; Busby v. Smith, Tex.Civ. App., 53 S.W.2d 138; McArthur v. Johnson, 61 N.C. 317, 93 Am.Dec. 593; Lanier v. John L. Roper Lumber Co., 177 N.C. 200, 98 S.E. 593." Dixon v. Kaufman, 58 N.W.2d at page 805.

If the plaintiffs had taken the time to look at the instruments underneath the oil, gas and mineral lease they would readily have discovered that they were not only signing an oil, gas and mineral lease but also two mineral deeds. The mineral deeds are headed in large black letters *"Mineral Deed."* The mineral deed form differs from the form of an oil, gas and mineral lease. A person of average intelligence, knowledge and experience could detect the difference if such person examined the instruments. It is presumed that a person takes ordinary care of his own concern. NDRC 1943, 31–1103, subd. 4.

These plaintiffs, by assuming that they were signing a mere copy of the oil, gas

and mineral lease and by failing to examine the second and third instruments which they actually signed, have put it in the power of the original mineral deed grantee to give other mineral deeds covering the same property to innocent purchasers who have parted with valuable consideration for the same.

> "Where the rights of an innocent purchaser may be affected by holding the deed inoperative to pass title, *only unusual circumstances,* such as *misreading the instrument to a blind or illiterate person, fraud on a mentally defective person, the surreptitious substitution of one instrument for another, or representation of its contents by a person in whom the grantor is entitled to place confidence,* will support a plea of fraud as to the character of the instrument." 16 Am.Jur., Deeds, Sec. 35, p. 458. (Emphasis supplied.)

None of these elements are present in this case. The purchasers of mineral interests from D. W. Crawford could not have ascertained that the original deed to him was procured by fraud. The deed and the certificate of acknowledgment were regular and a stranger to the original transaction had no way of knowing that the grantors did not appear before a notary. Examination of the original instrument or the record would not have disclosed any irregularity.

█ A certificate of acknowledgment by a notary on a deed, if regular on its face, is presumed to state the truth but it may be impeached by clear and convincing evidence. Yusko v. Studt, 37 N.D. 221, 163 N.W. 1066; Hazlett v. Mathieu, 57 N.D. 57, 220 N.W. 647; Cox v. McLean, 66 N.D. 696, 268 N.W. 686; Nichols v. Schutte, 75 N.D. 207, 26 N.W.2d 515.

█ There was nothing to put the purchasers from D. W. Crawford on notice of any irregularity in either the acknowledgment or fraud in the inception of his deed. Therefore, under the well established principle set forth, the plaintiffs must be the ones to suffer. Their own lack of diligence

and misplaced confidence in D. W. Crawford's agents has resulted in their loss and they must bear the burden thereof.

It is contended that the mineral deed constitutes a forgery and is, therefore, void for any purpose. As authority for that contention reference is made to the note in 14 A.L.R. at p. 316 following the case of Austin v. State of Tennessee, 143 Tenn. 300, 228 S.W. 60, and also the note in 56 A.L.R. 582, dealing with the procurement of a signature by fraud as a forgery. Particular reference is made to the case of Horvath v. National Mortgage Company, 238 Mich. 354, 213 N.W. 202, 56 A.L.R. 578. The annotation in 14 A.L.R. 316 states:

> "While the courts are not in entire accord on the question, in a majority of the cases it is held that fraudulently procuring a genuine signature to an instrument *does not* constitute forgery. Wells v. State, 89 Ga. 788, 15 S.E. 679; People v. Pfeiffer, 243 Ill. 200, 90 N.E. 680, 26 L.R.A.,N.S., 138, 17 Ann.Cas. 703; State v. Corfield, 46 Kan. 207, 26 P. 498; Johnson v. State, 87 Miss. 502, 39 So. 692; State v. Mitten, 36 Mont. 376, 92 P. 969; State v. Flanders, 38 N.H. 324; People v. Underhill, 142 N.Y. 38, 36 N.E. 1049, reversing 75 Hun. 329, 26 N.Y.S. 1030; Com. v. Sankey, 22 Pa. 390, 60 Am.Dec. 91; Hill v. State, 1 Yerg. 76 [9 Tenn. 76], 24 Am.Dec. 441." (Emphasis supplied.)

It is also stated:

> "In *some jurisdictions* the view is taken that the procuring of a genuine signature to an instrument by fraudulent representations constitutes forgery. State v. Shurtliff, 18 Me. 368; Com. v. Foster, 114 Mass. 311, 19 Am. Rep. 353; Gregory v. State, 26 Ohio St. 510, 20 Am.Rep. 774, 2 Am.Crim, Rep. 146. See also State v. Farrell, 82 Iowa 553, 48 N.W. 940."

This, however, is the minority rule.

In the case of Hauck v. Crawford, S.D., 62 N.W.2d 92, at page 94, the court com-

ments on the foregoing notes dealing with the procurement of a signature by fraud as forgery as follows:

"We are not inclined to accept the trial court's holding that the manner in which plaintiff's signature was obtained constituted a forgery. As disclosed by the notes in 14 A.L.R. 316 and 56 A.L.R. 582, such holding is a minority view, and seems to us unsound. We believe the rule we have announced in Federal Land Bank v. Houck, supra [68 S.D. 449, 4 N.W.2d 213], and in this opinion will better sustain the ends of justice. Our holding, we believe, recognizes actualities. The signature was the real signature of the plaintiff. True, plaintiff was induced to sign by a false representation, but to hold a signature thus obtained a forgery seems artificial and out of harmony with the actual facts." Hauck v. Crawford, S.D., 62 N.W.2d 92, 94.

Our statute defines good faith: "Good faith shall consist in an honest intention to abstain from taking any unconscientious advantage of another even though (through) the forms or technicalities of law, together with an absence of all information or belief of facts which would render the transaction unconscientious." NDRC 1943, 1-0121.

Insofar as the grantees of D. W. Crawford and their grantees are concerned there is a total absence of any evidence on which they could base any information or belief of facts which would render the transaction as to them unconscientious. They had a right to rely on the presumption of fair and honest dealing.

The mineral deeds given by D. W. Crawford and the mineral deeds made, executed and delivered by his grantees to other grantees are valid except as to the homestead property. These grantees obtained title to the minerals as bona fide purchasers for value without notice.

The judgment of the trial court is affirmed as to the homestead property and the mineral deed of the plaintiffs covering that property is void. As to the remaining real property of the plaintiffs involved in this action the mineral deeds in the hands of innocent purchasers for value are valid, and as to that property the judgment of the trial court is reversed.

MORRIS, C. J., and GRIMSON, SATHRE and BURKE, JJ., concur.