Paul J. HERMAN, Plaintiff
and Appellant,

v.

Terrance MAGNUSON and the City of
Grand Forks, a Municipality,
Defendants and Appellees.

Civ. No. 9482.

Supreme Court of North Dakota.

March 22, 1979.

Leland F. Hagen, of Ohnstad, Twichell, Breitling, Arntson & Hagen, West Fargo, for plaintiff and appellant.

F. John Marshall, of Letnes, Marshall & Hunter, Grand Forks, for defendant and appellee Terrance Magnuson.

James L. Lamb, of Degnan, McElroy, Lamb, Camrud, Maddock & Olson, Grand Forks, for defendant and appellee City of Grand Forks.

VANDE WALLE, Justice.

Paul J. Herman ["Herman"] brought a personal-injury action against Terrance Magnuson ["Terrance"] and the City of Grand Forks ["Grand Forks"] to recover damages for injuries sustained in a motor-vehicle accident. He appeals from the district court's judgment on the pleadings in favor of Grand Forks and summary judgment in favor of Terrance. We affirm the judgments of the district court.

In the early morning of November 21, 1975, a four-wheel-drive pickup truck driven by Eric Magnuson ["Eric"], Terrance's son, crossed the centerline on a skyway in Grand Forks and collided with an oncoming Toyota pickup truck in which Herman was a passenger. As a result of the collision, Herman suffered injuries that rendered him a paraplegic.

Herman based his action against Terrance on the "family car" doctrine, alleging that Terrance "owned, maintained or controlled" the pickup truck that Eric was driving when the collision occurred, that Terrance "furnished . . . [the truck] for the use, pleasure and business of himself and his household," and that "Eric Magnuson was a member of Terrance Magnuson's family and household, . . . " Herman based his action against Grand Forks on the City's alleged negligence "in the maintenance, design, approval and construction" of the skyway on which the collision took place.

After the parties conducted extensive discovery, Grand Forks filed a motion to dis-

miss the action, or, in the alternative, for judgment on the pleadings in its favor, contending that Herman failed to comply with the notice requirements of Section 40–42–02, N.D.C.C., and that Chapter 295, S.L. 1975, exempted it from liability arising out of negligence in the construction and design of a skyway. The district court found that Herman did not comply with the notice requirements of Section 40–42–02, N.D.C.C., and therefore granted judgment on the pleadings in favor of Grand Forks.

Thereafter, Terrance moved to dismiss Herman's action against him for failure to state a claim upon which relief could be granted. Terrance argued that the "family car" doctrine was inapplicable because he did not "own, maintain or control the Ford pickup" truck that Eric was driving in the collision, because Eric was not living in his household and because Eric, who held legal title to the truck, did not operate it with Terrance's express or implied permission. Treating the matter as a motion for summary judgment pursuant to Rule 56(c), North Dakota Rules of Civil Procedure, because both parties offered material outside their pleadings [Rule 12(b), N.D.R.Civ.P.], the district court granted summary judgment in favor of Terrance, concluding in essence that Eric was not a member of Terrance's family for purposes of the "family car" doctrine.

## HERMAN'S CLAIM AGAINST GRAND FORKS

Herman, in his appeal from the judgment on the pleadings entered by the district court in favor of Grand Forks, presents three issues:

"a. Was the 90 day notice requirement of North Dakota Century Code, Chapter 40–42 regarding actions against municipalities for defective streets and bridges impliedly repealed by the enactment of the Political Subdivision Tort Liability Act of 1975?[1]

"b. If said notice requirement was impliedly repealed, are the notice provisions in the Political Subdivision Tort Liability Act of 1975 conditions precedent to suit, or merely directory?[2]

"c. If the notice provisions of North Dakota Century Code, Chapter 40–42 were not thus repealed, is such notice requirement unconstitutional as a denial of equal protection, and are the notice provisions of the 1975 Act unconstitutional if found to be mandatory and not directory?"

■ In order to sustain his first issue, appellant must overcome this court's resistance to repeals of statutes by implication. See, e. g., *Rodgers v. Freborg*, 240 N.W.2d 63 (N.D.1976). However, the fundamental test in all cases pertaining to repeal by implication is the intent of the Legislature. See, e. g., *State v. Hagge*, 224 N.W.2d 560 (N.D.1974).

Chapter 40–42, N.D.C.C., was a special Act concerned only with claims against cities for injuries on the streets. Chapter 295, S.L.1975, on the other hand, was a

---

1. Section 40–42–01, N.D.C.C., provided, in part, at the time of the collision that resulted in this lawsuit and prior to its repeal by Chap. 303, S.L.1977:

   "Any claim against a municipality for damages or injuries alleged to have arisen from the defective, unsafe, dangerous, or obstructed condition of any street, crosswalk, sidewalk, culvert, or bridge of the municipality or from the negligence of the municipal authorities in respect to any such street, sidewalk, crosswalk, culvert, or bridge, shall be filed in the office of the city auditor within ninety days after the happening of such injury. . . ." [Repealed by Chap. 303, Sec. 18, S.L.1977.]

2. Chapter 295, Section 4 (Political Subdivision Tort Liability Act of 1975), provided, in part:

   "1. Except as otherwise provided, any claim against a political subdivision for injuries alleged to have arisen under the provisions of this Act shall be filed, within ninety days after the alleged occurrence of such injury, in the office of the county auditor. . . . Notice of such claim shall also be given by the claimant to the political subdivision concerned and to the attorney general within ten days of filing such claim with the county auditor."

   [The provisions of Chap. 295, S.L.1975, were effective through June 30, 1977, and thereafter had no force and effect, under Sec. 15 thereof.]

general Act concerned with tort liability of all political subdivisions, including cities.

Section 1–02–07, N.D.C.C., provides:

"Whenever a general provision in a statute shall be in conflict with a special provision in the same or in another statute, the two shall be construed, if possible, so that effect may be given to both provisions, but if the conflict between the two provisions is irreconcilable the special provision shall prevail and shall be construed as an exception to the general provision, unless the general provision shall be enacted later and it shall be the manifest legislative intent that such general provision shall prevail." [3]

■ A reading of Herman's complaint against Grand Forks convinces us that it comes within the purview of Chapter 40–42, N.D.C.C., because that chapter applied to any claim against a city

" . . . for damages or injuries alleged to have arisen from the defective, unsafe, dangerous, or obstructed condition of any street, crosswalk, sidewalk, culvert, or bridge of the municipality or from the negligence of the municipal authorities in respect to any such street, sidewalk, crosswalk, culvert, or bridge, . . . " Sec. 40–42–01, N.D.C.C.

Herman points out that the definition of the term "claim" in Chapter 295, Section 1, S.L.1975, would include the type of action commenced by him in this lawsuit.[4] He also argues that the definition of the term "political subdivision" as used in that section would include Grand Forks.[5] Finally, Herman submits that because Chapter 295, Section 3, S.L.1975, excludes claims for damage caused by the use or operation of motor vehicles or aircraft by a political subdivision from the terms of the Act, that exclusion is evidence of the Legislature's intent that all other claims should be covered thereunder, thus impliedly repealing the provisions of Chapter 40–42, N.D.C.C.[6]

■ Herman does not ask us to construe Chapter 40–42, N.D.C.C., and Chapter 295, S.L.1975, together; rather, he asks us to conclude that the latter enactment impliedly repealed the former. Such an argument necessarily prompts a conclusion that the two enactments are irreconcilable. Yet, if they are irreconcilable, his argument would contravene the provisions of Section 1–02–07, N.D.C.C., unless we find that it is the "manifest legislative intent that such general provision shall prevail." [7]

Grand Forks argues that because the 1975 legislation did not expressly repeal Sections 40–42–01, 40–42–02, and 40–42–03,

---

3. Section 1–02–07, N.D.C.C., was enacted as part of the North Dakota Revised Code of 1943. This court, however, as far back as *Reeves & Co. v. Bruening,* 16 N.D. 398, 114 N.W. 313 (1907), applied the rule that repeals by implication are not favored, and that the special provisions of a statute are not repealed by general provisions relating to the same subject matter unless the legislative intent to that effect is manifest.

4. Chapter 295, Section 1, S.L.1975, provided, in part:

"SECTION 1. DEFINITIONS. As used in this Act, unless the context or subject matter otherwise requires:

"1. 'Claim' means any claim brought against a political subdivision, as permitted by this Act, for an injury caused by an act or omission of a political subdivision or an employee of the political subdivision acting within the scope of his employment or scope of his office."

5. Chapter 295, Section 1(5), S.L.1975, defined the term "Political subdivision" to " . . . include all . . . cities . . . "

6. Contrary to Herman's contention, Chapter 295, Section 3, S.L.1975, did not exclude claims against a political subdivision for injuries arising out of, or by reason of, the use or operation of motor vehicles or aircraft by the political subdivision; rather, it excluded payment of claims based on such injuries from the political subdivisions liability fund. Despite this exclusion, the political subdivision remained liable for such injuries. It is clear, therefore, that this provision did not demonstrate legislative intent to repeal Chapter 40–42, N.D.C.C.

7. There may be some question whether the notice provisions of the two statutes can be reconciled. However, there are other provisions within the two enactments that would be difficult to reconcile: Chapter 40–42, N.D.C.C., contains no limitations on the amount of recovery against a city, while Chapter 295, S.L.1975, does contain such limitations.

N.D.C.C., and because these provisions were, in fact, expressly repealed by the Legislature in 1977,[8] the Act must have been in existence until July 1, 1977, when the repeal became effective. We note, however, that Chapter 303, Section 16, S.L. 1977, provides:

"If a claim against a municipality was filed in the office of the city auditor in accordance with section 40–42–01 after April 8, 1975, and prior to July 1, 1977, and the cause of action against the municipality was dismissed on the basis of failure to file the claim with the county auditor in accordance with section 4 of chapter 295 of the 1975 Session Laws of North Dakota, such claim is preserved and may be filed in the office of the city auditor within ninety days after the effective date of this Act. Notwithstanding sections 40–42–02 and 40–42–03, the time limits for rejecting a claim and for bringing an action shall be determined on the basis of the date a claim was filed as authorized by this section."

The action by the 1977 Legislature is not indicative of the intent of the 1975 Legislature.[9] See, e. g., *St. Vincent's Nursing Home v. Department of Labor,* 169 N.W.2d 456 (N.D.1969).

We are impressed by the fact that Chapter 295, S.L.1975, was an obvious legislative response to the invitation issued by this court in *Kitto v. Minot Park District,* 224 N.W.2d 795 (N.D.1974), wherein this court held that the political subdivisions of this State were not immune from tort liability, but delayed the effect of its decision, except with respect to the parties involved therein,[10] until fifteen days after adjournment of the 1975 Legislative Assembly. Thus Chapter 295, Section 13, S.L.1975, sets forth the legislative intent of the enactment as follows:

"It is the intent of the legislature that this Act is to provide the political subdivisions of this state with temporary protection only until July 1, 1977. This Act is deemed to be in the best interest of the people of this state and is an exercise of the police powers. *This Act is a temporary response to the recent judicial decision which held that the doctrine of governmental immunity from tort liability as it applies to political subdivisions should not be sustained in this state.* It is the policy of the legislature to encourage political subdivisions to continue to maintain present liability insurance coverage pending a legislative council study of governmental immunity and to encourage political subdivisions to maintain insurance coverage for motor vehicles and aircraft."[11] [Emphasis added.]

The legislative intent in enacting the 1975 law is clear. The Legislature was responding to this court's decision in *Kitto;* it was not attempting to repeal Chapter

---

8. Chapter 303, Section 18, S.L.1977.

9. We do not find persuasive the 1975 Legislature's failure to repeal Chapter 40–42, N.D.C.C., the 1977 Legislature's repeal of pertinent provisions of that chapter, or the 1977 Legislature's reinstatement of certain causes of action that apparently were filed pursuant to Chapter 40–42, N.D.C.C., but not pursuant to Chapter 295, S.L.1975, and were therefore dismissed. The 1977 Legislature enacted a substantially different political subdivisions tort liability Act, codified as Chapter 32–12.1, N.D.C.C., and may well have determined that it should supersede Chapter 40–42, N.D.C.C. If courts other than this court might have construed Chapter 295, S.L.1975, as impliedly repealing Chapter 40–42, N.D.C.C., such construction is not necessarily sanctioned by the legislative reinstatement of actions that were not filed in accordance with the 1975 enactment.

10. In *Kitto,* this court applied the "Sunburst Doctrine" and, except with respect to the parties involved, delayed the effect of the decision until fifteen days after the adjournment of the 1975 Legislative Assembly. In so doing, we stated that one of the objects to be accomplished by application of the doctrine was "to allow the legislature opportunity to adopt such legislation as it deems advisable to mitigate any hardships arising from this decision." 224 N.W.2d at 804.

11. See also Minutes, H.R. Comm. on Political Subdivisions, 44th Legis. Assembly (Feb. 7, 1975); Minutes, S. Comm. on Political Subdivisions, 44th Legis. Assembly (March 6 and 13, 1975); Minutes, Conf. Comm. (H.B.1591), 44th Legis. Assembly (March 20, 1975).

40–42, N.D.C.C. The declaration of legislative intent contained in Chapter 295, Section 13, S.L.1975, does not sustain a conclusion that Chapter 295, S.L.1975, should prevail over Chapter 40–42, N.D.C.C. Rather, it indicates that Chapter 295, S.L.1975, should apply only to those claims addressed in *Kitto*. The claim advanced by Herman against Grand Forks was statutorily authorized by Chapter 40–42, N.D.C.C., before this court decided *Kitto*.[12] Thus it was not affected by *Kitto* or by legislation necessitated by *Kitto*.

We conclude that Chapter 40–42, N.D.C.C., was not impliedly repealed by Chapter 295, S.L.1975. Hence, to bring his action against Grand Forks, Herman was required to give Grand Forks notice in accordance with Section 40–42–01, N.D.C.C. Because of this conclusion, we need not consider whether the notice provision in Chapter 295, S.L.1975, is a condition precedent to the suit against Grand Forks or whether it is merely directory.[13]

Because we have held that Herman's claim against Grand Forks is governed by Chapter 40–42, N.D.C.C., we must consider the third issue, i. e., the constitutionality of Sections 40–42–01 and 40–42–02, N.D.C.C.[14] Herman concedes that Section 40–42–02, N.D.C.C., makes the filing of the notice a condition precedent to instituting an action

against the City. Section 40–42–02 provided:

"No action shall be maintained against any municipality . . . unless it shall appear that the claim upon which the action is brought was filed in the office of the city auditor as required by Section 40–42–01, . . . "

Herman also concedes that he did not file a claim within the time required in Section 40–42–01, N.D.C.C., and did not file any such claim prior to the commencement of the action against the City of Grand Forks. However, Herman contends that the requirements of Sections 40–42–01 and 40–42–02, N.D.C.C., violate his constitutional right of equal protection as guaranteed by the Fourteenth Amendment to the United States Constitution.[15]

■ This court has previously discussed three standards of review to be used in a constitutional challenge to a statute. In *Arneson v. Olson,* 270 N.W.2d 125 (N.D. 1978), we stated:

"In *Johnson v. Hassett* [217 N.W.2d 771 (N.D.1974)], we referred to the three standards of scrutiny of equal-protection questions for a judicial adjudication of constitutionality which appeared to have evolved in the Federal courts. One is the traditional reasonable or rational-basis standard under which a statute will be

---

**12.** Chapter 40–42, N.D.C.C., had been in effect in some form since 1893. See Chapter 31, S.L.1893.

**13.** Herman's argument is that because Section 40–42–02, N.D.C.C., prohibited the commencement of an action unless the claim was filed pursuant to Section 40–42–01, N.D.C.C., while Chapter 295, S.L.1975, contained no such prohibition, the notice provision under Chapter 295 was merely directory.

**14.** The court referred to this issue in *Sande v. City of Grand Forks,* 269 N.W.2d 93, 99 (N.D. 1978):

"As for the failure to file a claim within 90 days, we could cite it as a second ground for affirmance, since we have held Chapter 295 applicable, and it is conceded that no claim was filed. However, such short statutes of limitation may be open to constitutional objection. See *Reich v. State Highway Department,* 386 Mich. 617, 194 N.W.2d 700 (1972), and see *Christensen v. Midstate Aerial Appli-*

*cators Corp.,* 166 N.W.2d 386, 37 A.L.R.3d 827 (N.D.1969), where a similar question was raised but not decided. We are therefore reluctant to base an opinion upon failure to file a claim within a short period, in the absence of briefing and argument on the possible constitutional question."

Many legal writers have also examined this question. See, e. g., "Delay in Notice of Tort Claim Against a Government Agency," 20 Clev. St.L.Rev. 23 (1971); Comment, "Idaho Tort Claims Act: Notice of Claims," 12 Idaho L.Rev. 169 (1976); Note, "Notice of Claim Under the Municipal Tort Claims Act—The Watchdog With Plenty of Teeth," 23 Drake L.Rev. 670 (1974); 23 Drake L.Rev. 696 (1974); 46 Ind.L.J. 428 (1971); 55 Tex.L.Rev. 739 (1977); Annot., 59 A.L.R.3d 93 (1974).

**15.** See also N.D.Const., Sec. 11, which provides: "All laws of a general nature shall have a uniform operation."

upheld if its classifications are not patently arbitrary and bear a reasonable relationship to a legitimate government interest. However, if the case involves an 'inherently suspect classification' or a 'fundamental interest,' it is 'subjected to strict judicial scrutiny.' A third, less clearly defined, category requires a 'close correspondence between statutory classification and legislative goals.' In *Johnson v. Hassett, supra,* we said that this latter test closely approximates the substantive due-process test historically used by this and other State courts." 270 N.W.2d at 132–133.

This court applied the reasonable or rational-basis test in *Tharaldson v. Unsatisfied Judgment Fund,* 225 N.W.2d 39 (N.D. 1974), which involved an equal-protection challenge to statutes limiting recovery from the Unsatisfied Judgment Fund to $5,000 in those cases in which the tortfeasor could not be ascertained, while permitting a recovery of $10,000 in other cases. This court rejected the challenge, concluding that the purpose of the Fund was to provide some compensation to victims of automobile accidents who otherwise would be left without a means of recovery and that the allocation among recipients, the amount available, the number of other State functions in need of money, and other considerations were matters within the competency of the Legislature.

The most severe test of constitutionality—strict scrutiny—was applied in *State ex rel. Olson v. Maxwell,* 259 N.W.2d 621 (N.D. 1977), in which this court required a hearing before a female prisoner could be transferred to a facility outside North Dakota for incarceration.

*Tharaldson v. Unsatisfied Judgment Fund, supra,* and *State ex rel. Olson v. Maxwell, supra,* represent the two extren..s in constitutional analysis of a statute. The intermediate analysis, the third approach, requires the court to look closely at the correspondence between the statutory classification and legislative goals. In *Johnson v. Hassett,* 217 N.W.2d 771 (N.D.1974), this court concluded that the "guest statute,"

prohibiting a person who accepts a ride in any vehicle without giving compensation therefor from recovering for damages caused by the ordinary negligence of his host, violated Sections 11, 13, and 20 of the North Dakota Constitution. The court wrote:

"We find that the statutory classification is unreasonable for any proper purpose of legislation and is not based upon justifiable distinctions concerning any proper purpose of the law, and that it is arbitrary and overinclusive." 217 N.W.2d at 780.

While this court in *Johnson* did not specify the standard of scrutiny it was applying in express words, a reading of the case establishes that the court used the intermediate approach. See *Arneson v. Olson, supra,* 270 N.W.2d at 133. Statutory justifications were propounded, scrutinized, and ultimately rejected by the court.

The issue herein is more closely related to that in *Johnson v. Hassett, supra,* than to the issue in either *Tharaldson* or *State ex rel. Olson v. Maxwell, supra.* In *Tharaldson,* the plaintiff, who could not identify the tortfeasor, would have had no recourse except for the action of the Legislature. Because the Legislature created the plaintiff's right of action, it could constitutionally impose reasonable limits on the right to bring that action. Following the rationale of *Kitto,* however, Herman's right of action was not created by the Legislature but rather has been limited by the Legislature pursuant to Chapter 40–42, N.D.C.C. Moreover, unlike *State ex rel. Olson v. Maxwell, supra,* this appeal does not involve a "suspect classification," nor does it involve a "fundamental interest." Instead, as in *Johnson,* the issue we are here concerned with involves a limitation upon the authority of an injured party to bring an action against the tortfeasor. While the proscription in *Johnson* was more severe than in the instant case, we nevertheless believe that the standard of judicial review adopted therein is applicable in the present instance, and we conclude that this intermediate level of judicial scrutiny should be applied in examining the

provisions of Sections 40–42–01 and 40–42–02, N.D.C.C.

■ In support of his equal-protection contention, Herman cites as authority a line of cases based primarily on *Reich v. State Highway Department,* 386 Mich. 617, 194 N.W.2d 700 (1972). The Michigan Legislature waived sovereign immunity of the State of Michigan but provided that a claim against the State was barred if notice of the claim was not served on the State within sixty days after the injury occurred. In *Reich,* the Supreme Court of Michigan, with one justice dissenting, held that the notice provision violated equal protection, and stated:

> "The object of the legislation under consideration is to waive the immunity of governmental units and agencies from liability for injuries caused by their negligent conduct, thus putting them on an equal footing with private tort-feasors. However, the notice provisions of the statute arbitrarily split the natural class, i. e., all tort-feasors, into two differently treated subclasses: private tort-feasors to whom no notice of claim is owed and governmental tort-feasors to whom notice is owed.'
>
> "This diverse treatment of members of a class along the lines of governmental or private tort-feasors bears no reasonable relationship under today's circumstances to the recognized purpose of the act. It constitutes an arbitrary and unreasonable variance in the treatment of both portions of one natural class and is, therefore, barred by the constitutional guarantees of equal protection." 386 Mich. at 623, 194 N.W.2d at 702.

The Michigan Legislature amended the Act challenged in *Reich* to provide for a 120-day notice provision, but this was also declared violative of equal-protection guarantees in *Hobbs v. Michigan State Highway Dept.,* 58 Mich.App. 189, 227 N.W.2d 286 (1975).[16]

16. In *Forest v. Parmalee,* 402 Mich. 348, 262 N.W.2d 653 (1978), the court held that a rational basis existed for a legislative classification requiring actions based on alleged negligence of a governmental entity in maintenance or construction of a highway to be brought within two years while permitting certain actions against private tortfeasors to be brought within three years. The court rejected the "strict scrutiny" test, concluding that it was not dealing with a fundamental right because the Legislature permitted the right of action and therefore could place a reasonable time limit on plaintiffs' exercise of that right. It applied, instead, the "reasonable basis" test. The plaintiffs relied upon *Reich,* but the Michigan court distinguished that decision, noting:

> "In the instant case, we are persuaded that there is a rational basis for enacting a shorter statute of limitations for victims of governmental tortfeasors than for victims of private tortfeasors. *Reich* can be distinguished on the quite reasonable grounds that a two-year statute of limitations places significantly less of a hardship upon plaintiffs than does the *Reich* 60-day notice requirement. The 60-day notice requirement was unreasonable because it unduly restricted the substantive right to proceed against the governmental tortfeasor. The two-year statute of limitations constitutes a reasonable procedural requirement which is not nearly as harsh or arbitrary in its consequences for plaintiffs.
>
> "Therefore, we determine that the decision in *Reich* as to the notice requirement does not dictate that we also must hold the instant statute of limitations unreasonable in these cases and thus violative of equal protection.
>
> "Furthermore, we would submit that a rational basis does exist for a two-year statute of limitations as to claims by victims of governmental tortfeasors as opposed to claims by victims of private tortfeasors. The statute unquestionably affords plaintiffs a reasonable time within which to commence suit. However, by setting a time limit of two years, the state is assured that plaintiffs will promptly conduct such investigations as necessary to determine the merits of their claims *and* will not be unduly dilatory in commencing their suits. This is especially important in times such as these when governments are continually launching highway improvement programs.
>
> "Moreover, the statute is essential to the organization of the finances of state and local government agencies in that it allows them to estimate with some degree of certainty the extent of their future financial obligations. It cannot be overlooked that no private party has a potential tort responsibility comparable to that of the government for injuries allegedly caused by defective or unsafe conditions of highways." 402 Mich. at 359–360, 262 N.W.2d at 657–658.

Two of the Michigan justices concurred specially, stating that *Reich* was wrongly decided. Three justices concurred specially, concluding that the statute does not create two classifica-

The Nevada Supreme Court, with two justices dissenting, relied upon *Reich* and reached a similar conclusion in *Turner v. Staggs,* 89 Nev. 230, 510 P.2d 879, 59 A.L. R.3d 81 (1973). Other courts citing the decision in *Reich* have reached the same conclusion. See, e. g. *O'Neil v. City of Parkersburg,* W.Va., 237 S.E.2d 504 (1977); *Hunter v. North Mason High School,* 85 Wash.2d 810, 539 P.2d 845 (1975). These decisions contain little or no discussion of the standard of constitutional review to be applied to statutes such as the ones here under consideration.

But in *Parton v. City of Huntsville,* 362 So.2d 898 (Ala.1978), the court rejected *Reich* and its progeny and upheld a statute requiring the filing of tort claims for damages against municipalities within six months from the accrual of the claim. The court, discussing the cases cited above, stated:

"Admittedly, the courts in those states, construing statutes abolishing governmental immunity, found that the legislature of each state had intended to put *all* tortfeasors on an equal footing; therefore, each court found that the diverse treatment of private tortfeasors and government tortfeasors was arbitrary and unrelated to the purpose of the legislation. We fail to find that Alabama's legislative scheme to eliminate the defense of governmental immunity in certain areas gave to an injured claimant an *unconditional* right to sue. In fact, legislative intent is to the contrary; included in the overall scheme were conditions, limitations, and requirements on the part of the injured claimant. In short, the Alabama legislature created a *conditional* right to sue in limited circumstances. [Citation omitted.]

.     .     .     .     .

"The legislature has a wide discretion to enact laws which affect some groups of citizens differently than others. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it. *McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). Among the purposes of the notice statutes is to enable the municipality to investigate and determine the merits of the claim and to adjust claims without the expense of litigation if the circumstances warrant. [Citations omitted.] These purposes are reasonable and therefore do not constitute an arbitrary and unconstitutional exercise of legislative power." [Emphasis in original.] 362 So.2d at 900–901.

It is apparent that the Alabama court applied the least onerous constitutional analysis—the reasonable-basis test.

In *Fritz v. Regents of University of Colorado,* Colo., 586 P.2d 23 (1978), the court rejected a constitutional challenge of a Colorado statute requiring that, in order to bring an action against a public entity, the person claiming to have suffered an injury must file a written notice within ninety days after the date of discovery of the injury. The court apparently used the rational-basis test because it indicated that, absent a suspect classification or infringement upon a fundamental right, its analysis of a statute attacked on equal-protection grounds "depends upon whether the statute rationally furthers a legitimate state interest." Colo., 586 P.2d at 25. The court concluded that the statutory notice requirements rationally furthered legitimate state interests, stating:

"Those interests include fostering prompt investigation while the evidence is still fresh; repair of any dangerous condition; quick and amicable settlement of meritorious claims; and preparation of fiscal planning to meet any possible liability. In addition, in light of the numbers of public entities, the notice requirement .   .   . is a certain means by which the

tions among victims of the same tort because there is no explicit or implied obligation to be imposed upon any private parties under the statutes imposing on various governmental agencies the obligation to maintain highways in a safe manner. They therefore concluded that there was no equal-protection analysis necessary. While not overruling *Reich, Forest* might be considered a shift in the position of the Michigan court.

state or its subdivisions may be alerted to potential liability arising from a governmental activity." 586 P.2d at 25.[17]

The court specifically rejected, as contrary to the weight of authority, the rationale set forth in *Reich* and other cases relying on *Reich*.

We adopt the reasoning from *Fritz v. Regents of University of Colorado, supra,* because we conclude that it establishes a close correspondence between the statutory classification and legislative goals. At least a part of the legislative goals enumerated in *Fritz* have long been recognized by this court. In *Hooge v. City of Milnor,* 56 N.D. 285, 217 N.W. 163 (1927), this court stated:

"Charter provisions, such as those contained in the above statute, are said to be in derogation of common right, and they are therefore to be strictly construed 'so far as concerns the necessity for such notice.' 43 C.J. 1186. *Without doubt the Legislature may properly provide for the protection of municipal corporations from the consequences of damage suits arising out of claims which they shall not have had ample opportunity to investigate;* but, where they have had such an opportunity, through a notice given, the sufficiency of the notice under the statute requiring it as a remedial matter, and the statutory provisions concerning the contents of the notice should be liberally construed. 43 C.J. 1186, § 1957. But there must be a substantial compliance with the statute. 43 C.J. § 1962; 4 Dillon's Municipal Corporations (5th Ed.) § 1613." [Emphasis added.] 56 N.D. at 291, 217 N.W. at 165.

The other goals enunciated in *Fritz* have not been so firmly acknowledged by this court but they are obvious goals for legislative enactments of this nature.

The logic of *Parton v. City of Huntsville, supra,* and *Fritz v. Regents of University of Colorado, supra,* satisfies the intermediate level of judicial scrutiny set forth in *Johnson v. Hassett, supra.* We conclude that

Sections 40–42–01 and 40–42–02, N.D.C.C., did not deny Herman his constitutional right of equal protection.

For reasons set forth herein, the judgment of the trial court in favor of Grand Forks is affirmed.

## HERMAN'S ACTION AGAINST TERRANCE

In *Schoonover v. Morton County,* 267 N.W.2d 819, 821–822 (N.D.1978), this court gave a resumé of its previous decisions on the law of summary judgments in North Dakota:

"A motion for summary judgment will be granted only if, after taking a view of the evidence in a light most favorable to the party against whom summary judgment is demanded, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), N.D.R.Civ.P., *Farmers Elevator Co. v. David,* 234 N.W.2d 26, 29 (N.D.1975); *Perdue v. Knudson,* 179 N.W.2d 416, 420 (N.D.1970).

"We have also said that summary judgment is available to allow for prompt disposition of a controversy on the merits without a trial where there is no dispute as to the salient facts, or when only a question of law is involved and its purpose is to promote the expeditious disposition of cases. *Zuraff v. Empire Fire & Marine Ins. Co.,* 252 N.W.2d 302, 307 (N.D.1977); *Rude v. Letnes,* 154 N.W.2d 380, 381 (N.D.1967).

"Finally, when a motion for summary judgment is made and supported as provided in the rule for summary judgment, the adverse party may not rest upon mere allegations or denials of his pleadings, but his response, by affidavit or as otherwise provided in the rule, must set forth specific facts showing that there is a genuine issue for trial. Otherwise, if appropriate, summary judgment should be entered against him. Rule 56(e), N.D.

17. For similar reasoning, see, e. g., *Fuller v. Rutgers, State University,* 154 N.J.Super. 420, 381 A.2d 811 (1977), *certification denied* 75 N.J. 610, 384 A.2d 840 (1978); and *Lunday v. Vogelmann,* 213 N.W.2d 904 (Iowa 1973).

R.Civ.P., *Johnson v. Community Development Corp. of Wahpeton,* 222 N.W.2d 847, 850 (N.D.1974); *Ray v. Northern Sugar Corp.,* 184 N.W.2d 715, 718 (N.D.1971)."

■ Even absent a genuine issue as to a material fact, summary judgment might be improper. In *Albers v. NoDak Racing Club, Inc.,* 256 N.W.2d 355, 358 (N.D.1977), this court wrote:

". . . Chief Justice Erickstad in *Farmers Elevator Co. v. David,* 234 N.W.2d 26 (N.D.1975), said:

'When the facts may not be in dispute but the inferences reasonably deducible therefrom may be conflicting, summary judgment is inappropriate.'

It follows that a summary judgment should be granted only if there is no genuine issue of fact *and* there is no conflicting inference from the facts." [Emphasis added.]

Herman bases his lawsuit against Terrance on the "family car" doctrine. Although this court has defined this doctrine, sometimes called the "family purpose" doctrine, many times in the past [see, e. g., *Mertz v. Weibe,* 180 N.W.2d 664 (N.D.1970); *Lauritsen v. Lammars,* 161 N.W.2d 804 (N.D.1968)], it has not, as this case demonstrates, resolved certain issues concerning application of the doctrine. For a summary of the various definitions propounded by this court, see *Lauritsen v. Lammars, supra,* 161 N.W.2d at 807–810.

Numerous courts have discussed the development, purposes, and application of the doctrine. See, e. g., *Michaelsohn v. Smith,* 113 N.W.2d 571 (N.D.1962); *Pesqueira v. Talbot,* 7 Ariz.App. 476, 441 P.2d 73 (1968); *Smith v. Simpson,* 260 N.C. 601, 133 S.E.2d 474 (1963). See also Annot., 8 A.L.R.3d 1191 (1966). In North Dakota, the master-servant relationship, not consanguinity, forms the theoretical basis of the "family car" doctrine. See, e. g., *Carpenter v. Dunnell,* 61 N.D. 263, 237 N.W. 779 (1931).[18] The agency-related basis of the doctrine "is a fiction dictated by considerations of public

policy." *Michaelsohn v. Smith, supra,* 113 N.W.2d at 573. This public policy is "that of giving an injured party, who is free of negligence, a cause of action against a financially responsible defendant. The doctrine was an extension of previously established rules of liability in order to 'advance the dictates of natural justice.' Its application, therefore, should only be coextensive with its purpose." *Michaelsohn v. Smith, supra,* 113 N.W.2d at 574.

To determine the applicability of the "family car" doctrine to this cause of action we must examine additional facts surrounding the relationship between Terrance and Eric and the acquisition of the truck by Eric. From 1973 until 1975, Eric served in our country's military. During that time, he often used Terrance's home or business address as his own home address on documents and correspondence that he considered important. Also, beginning in 1972, he maintained a checking account with check blanks listing Terrance's address as his home address.

When Eric completed his term of military duty in April, 1975, he settled in the Grand Forks area. He began to work for a company owned by Terrance and he was employed by that company at the time of the collision. Upon his arrival in the Grand Forks area, he resided in Terrance's home in East Grand Forks. He then lived with his brother and a friend in an apartment in Grand Forks. Finally, in November, 1975, Eric, his brother, and a friend moved into a trailer home in Grand Forks owned by Terrance. Eric lived there until the time of the collision. Terrance charged no rent for the use of the trailer, but required that the three men pay the trailer lot rent and any utility expenses that they incurred.

Sometime in 1975, Eric expressed a desire to acquire a four-wheel-drive pickup truck. When Terrance learned of this, he contacted a friend employed at a Wisconsin vehicle dealership and asked him to watch for such

18. Some courts and legal scholars have pointed out incongruities between the "family car" doctrine and agency law. See, e. g., *Pesqueira v.*

*Talbot, supra,* 7 Ariz.App. at 479, 441 P.2d at 76.

a vehicle. Approximately three weeks later, Terrance was informed by his friend that a used four-wheel-drive pickup truck was available for $4,600.

Soon thereafter, Eric went to Wisconsin to purchase the vehicle. He paid for it with $600 of his own and a $4,000 interest-free loan from his father, which he agreed to repay at a rate of $100 per month.[19] The sales receipt and car invoice that Eric received from the Wisconsin dealer originally denominated Terrance as the purchaser of the truck, but at some time (unknown to us) Terrance's name was lined out and was replaced with Eric's name. The Wisconsin motor vehicle title denominated Eric as the purchaser of the truck.

After returning to Grand Forks with the truck, Eric, in his own name, applied to and received from the North Dakota Motor Vehicle Department a certificate of title and a registration card for the truck. He obtained automobile insurance upon Terrance's advice from the same insurance agent who insured Terrance. Eric kept this insurance policy, along with assorted other personal papers related to the truck, at Terrance's place of business. Although Eric used the truck predominantly for personal affairs, he and others occasionally used it in the course of their employment at Terrance's company. This employment-related use of the truck sometimes entitled Eric to charge gasoline for the truck to Terrance's account at a Grand Forks service station.

After the collision from which this case arises, Eric received a payment of $4,600 from his insurance company for the damage to his truck. He paid $3,850 of this money to Terrance in repayment of that portion of the vehicle loan still outstanding and other advances that he received from his father.

The relationship between Terrance and Eric during the events herein relevant can best be characterized as a normal father-son relationship. The two men frequently engaged in joint sport activities. Eric was always welcome at Terrance's home and often dined there. It appears from the record that he frequently sought Terrance's advice on matters concerning his personal affairs.

*Legal Title*

Herman argues that Terrance can be held liable under the "family car" doctrine even though Eric, not Terrance, held legal title to the truck that Eric drove in the collision. Disputing this argument, Terrance notes that this court has never held the doctrine applicable in a case in which the head of the household lacked legal title to the vehicle involved in a collision. He directs us to North Dakota Jury Instruction 280, which in pertinent part provides:

"Applying [the 'family car'] doctrine it must be established:

"1. that the Defendant was the head of a family and the owner of the motor vehicle involved in the mishap; . . ."

■ We agree that in the past whenever this court has found the "family car" doctrine applicable, the head of the household held legal title to the vehicle involved in the collision. Nevertheless, this does not establish that a head of household's lack of legal title precludes application of the doctrine. It indicates only that this is a case of first impression, which we must treat *sui generis.* Furthermore, the North Dakota Jury Instructions, in part based upon language found in our decisions, have not been adopted by this court as rules of law. While sometimes persuasive, they are not always controlling authority in cases before the court. See, e. g., *Lauritsen v. Lammers, supra.* In this case, which involves a legal issue never considered by this court, North Dakota Jury Instructions 280 is not persuasive.

■ Because no North Dakota case law aids our consideration of this issue, we must examine the decisions of courts in other jurisdictions that have faced this problem.

19. The record does not indicate whether his agreement to repay the loan was oral or written. In any event, at the time of the collision, Eric had made at least two $100 monthly loan payments to his father.

In *Sledge v. Law,* 113 Ga.App. 746, 149 S.E.2d 758 (1966), the plaintiff, injured in an automobile collision, based his action on the "family car" doctrine. He appealed from a summary judgment in favor of one defendant, the father of the allegedly negligent driver of the car that injured him. The father had endorsed a note made by his son, the driver, to a bank for a loan to purchase the automobile involved in the collision. The son, who was under the age of 21 and resided in his father's home, used his own money for the downpayment to purchase the automobile and used money obtained through employment to reduce the outstanding balance of the note to $400. At that point, as a gift and inducement for his son to resume his academic studies, the father paid the remaining $400 balance of the note. The automobile was registered in the son's name but was insured by the father in his own name. After the son returned to school, the father paid the son's personal expenses including maintenance of the automobile. On these facts the lower court found the doctrine inapplicable. Using the Georgia variation of the "family car" doctrine, which applies when "the head of a family has supplied the vehicle" for the use of other members of the family, the Supreme Court reversed the lower court's decision and held that: "These facts show that the father supplied the automobile for the use of the son." 113 Ga.App. at 748, 149 S.E.2d at 759–760.

*Pesqueira v. Talbot,* 7 Ariz.App. 476, 441 P.2d 73 (1968), relied in large part on *Sledge v. Law, supra,* to reverse a lower court's summary judgment granted against the plaintiff and in favor of the parents of a minor child whose allegedly negligent operation of an automobile resulted in injuries to the plaintiff. Both the defendant child and her defendant mother contributed to the purchase price of the automobile. The child held legal title to the automobile, and stated in an affidavit that she "made all payments for maintenance and repair of the Corvette; that she did not need her mother's permission to use it; and that her mother exercised no control over the automobile or her use thereof." 7 Ariz.App. 478, 441 P.2d at 75. The payment to the automobile dealer for the purchase of the automobile comprised money saved by the child and an interest-free loan from the mother to the child which the child was to repay at a rate of $120 per month. Testimony indicated that the child had made seven $120 loan payments to her mother at the time of the accident and had repaid the loan completely within 11 months after the accident. First, the court discussed the Arizona version of the "family car" doctrine:

". . . there must be a family with sufficient unity so that there is a head of the family, the motor vehicle responsible for the injury must have been one 'furnished' by the head of the family to a member of the family and this vehicle must have been used on the occasion in question by the family member with the implied or express consent of the head of the family for a family purpose." 7 Ariz. App. at 480, 441 P.2d at 77.

Then, turning to the facts, the court stated:

"As to the question of 'furnishing,' we think that in view of the substantial role of the mother in financing acquisition of the Corvette automobile, a trier of fact might conclude that this car was 'furnished' by her . . . [A] permissible connotation in light of our Supreme Court's pronouncements is that the parent 'furnishes' the motor vehicle when the parent through a substantial gift or a nonbusinesslike loan makes it possible for the child to purchase a car that the child would otherwise not have been able economically to acquire. We believe this is the test used, though not verbalized, in *Sledge v. Law,* 113 Ga.App. 746, 149 S.E.2d 758 (1966).

"From the perspective of the socio-economic objective, we can see at least as much reason to enforce the doctrine when the car is made available by a parental, nonbusinesslike loan as when the car is a gift from the parent. From the standpoint of the persons who may be injured by the vehicle furnished, a loan is more disadvantageous than a gift, for the child will usually be more impecunious if he

has been a borrower of money rather than a donee. As far as 'control' is concerned, the lender has the leverage of the legal right to enforce repayment while the donor has no such right.

.   .   .   .   .

"Insofar as this intra-familial type of loan is concerned, at such times as it might be repaid, the element of 'furnishing' may cease, but this is not before us now, as it is undisputed there was a substantial 'loan' still outstanding at the time of this accident." 7 Ariz.App. at 481, 441 P.2d at 78.

Another court, in *Calhoun v. Eaves,* 114 Ga.App. 756, 152 S.E.2d 805 (1966), turned to *Sledge v. Law, supra,* for guidance but, unlike the courts in *Sledge* and *Pesqueira,* found the doctrine inapplicable. There, with the permission of his father, a 19-year-old, fully emancipated college student purchased an automobile with his personal check. He obtained the funds to pay for the vehicle through the sale of stock that it appears he had received from his father as gifts over a period of five years before the purchase. Delay in the transfer of the proceeds of the stock sale, however, caused the son to borrow funds from his father to pay for the car. The son repaid this loan to his father on the same day that he received the stock-sale proceeds. It appeared that the son applied to the State of Louisiana for vehicle title and registration papers in his own name. Yet the vehicle was listed on the father's liability insurance policy, and the premiums for this insurance coverage were paid by the father. After the collision resulting in the suit, in which the son was killed, the father claimed and collected $1,000 for burial expenses as the insured under the policy. The court, affirming a lower court's summary judgment in favor of the father, stated:

"The evidence . . . in no wⳕy controverts the undisputed evidence that the son, an emancipated minor, purchased the vehicle in his own name for his own

use, that the funds received from his father were a loan which the son repaid from assets exclusively under his control, and that the vehicle was at all times under the exclusive custody and control of the son, up to and including the time of the collision of plaintiff's vehicle. How can it then be said that this was a vehicle furnished by the father as head of the family for a family purpose, and that it was being so used at the time of the unfortunate incident? The answer to this question is necessarily in the negative.

"The facts of the present case distinguish it from the recent case of *Sledge v. Law,* 113 Ga.App. 746, 149 S.E.2d 758. In that case the father actually supplied the vehicle for the use of his minor son, by endorsing the note for the purchase money, and assuming liability and paying the balance due on the note as a gift to his son and as an inducement to the son to return to school, whereas in the present case the son, free of any disability attaching to a minor, supplied his own vehicle for his own use, incidentally using the proceeds of an unsecured loan from his father which he immediately repaid from the proceeds of the sale of stocks which he owned." 114 Ga.App. at 760, 152 S.E.2d at 808.

*Sledge, Pesqueira,* and *Calhoun* demonstrate, first, that the head of the household need not hold legal title to a vehicle to come within the grasp of the "family car" doctrine, and, second, that the application of the doctrine to a case in which the head of the household does not hold legal title will turn on the particular facts of that case.[20] We hold that to be liable under the "family car" doctrine the head of the household must *furnish,* but need not own, the vehicle for the use, pleasure, and business of himself or a member of his family.

■ The line separating *Sledge* and *Pesqueira* on the one side and *Calhoun* on the other is ill-defined. Slight factual variations in each of these cases would, in all

20. In addition to the cases that we have examined in this opinion, see, e. g., *Dillard v. Clements,* 144 Ga.App. 512, 241 S.E.2d 838 (1978);

*Griffin v. Pancoast,* 257 N.C. 52, 125 S.E.2d 310 (1962).

probability, have produced different results. While the element of furnishing does not hinge on legal ownership, we cannot state exhaustively the complete range of factual patterns sufficient to satisfy this requirement. Important considerations are who paid for the car, who had the right to control the use of the car, the intent of the parties who bought and sold the car, the intent of the parents and the child as to who, between them, was the owner of the car, to whom the seller made delivery of the car, who exercised property rights in the car from the date of its purchase to the date of the accident, and any other evidence that bears on the issue of who is the owner in fact.[21]

Mindful that this is an appeal from a summary judgment, we find sufficient evidence, and inferences from the evidence, to establish the existence of a genuine issue as to one element of the "family car" doctrine—the furnishing element.

The parties agree that Terrance, not Eric, sought out and discovered the truck through a friend in Wisconsin. This is evidence of the furnishing requirement not present in *Sledge, Pesqueira,* and *Calhoun.* Moreover, it is clear that with an interest-free loan, Terrance enabled Eric to consummate the purchase of the truck. In fact, Terrance testified during his deposition that without the loan, Eric would not have had sufficient funds with which to purchase the truck. *Pesqueira* and *Calhoun* contained evidence of similar parental loans. Like *Pesqueira,* but contrary to *Calhoun,* at the time of the accident Eric had only partially repaid the loan to his father. This fact distinguishes the case at bar from *Calhoun.* Finally, periodic use of the truck in the furtherance of Terrance's business, and Eric's concomitant authority to charge some of the truck's gasoline to Terrance's service station account, provide significant evidence of the furnishing requirement. Despite the assertions of both Terrance and Eric that Eric owned and controlled the truck, these factors create an arguable inference that Terrance exercised some control over the truck and maintained at least some property interest in it.[22]

*Family Membership*

Herman argues that Terrance's and Eric's maintenance of separate residences does not foreclose application of the doctrine. Terrance cites *Bryan v. Schatz,* 77 N.D. 9, 39 N.W.2d 435 (1949), and various dictionary definitions of the terms "family" and "household" in support of his argument that because Terrance and Eric did not reside under the same roof, Eric was not a member of Terrance's family and therefore the doctrine is inapplicable. We agree that Eric is not a member of Terrance's family for purposes of the "family car" doctrine. Contrary to Terrance's suggestion, however, we do not premise our holding on their maintenance of separate physical abodes.

*Bryan v. Schatz, supra,* presented this court with the same issue that it faces herein, that is, whether a son whose negligent operation of a motor vehicle that resulted in injuries to plaintiff was a member of his father's family for purposes of the "family car" doctrine. In *Bryan,* the court delineated in general terms the factors relevant to a resolution of this issue:

"When the head of a family provides an automobile for the use and pleasure of the members of the family and permits them to use it [at] will, they become the agents of the head of the family for the purposes of such use which includes their own personal pleasure, and when they are so using the automobile the head of the

---

21. We draw these considerations from *Jerdal v. Sinclair,* 54 Wash.2d 565, 342 P.2d 585 (1959), in which the court upheld a jury instruction designating these factors as important in the determination of ownership for purposes of the "family car" doctrine.

22. We do not hold that whenever a parent makes a gift of a motor vehicle to a child or a loan to a child for the purchase of a motor vehicle the "family car" doctrine is applicable. As the situation moves away from existence of a proprietary interest held by the parent after the transfer, or toward the existence of an arm's-length business relationship during the transfer, application of the doctrine becomes less likely.

family is liable to respond in damages for injuries resulting from their negligence under the doctrine of respondeat superior. The membership of the family is not determined by blood or marital relationship to the owner. The existence or non-existence of such a relationship is not determinative of the owner's liability. Neither is minority the test. These matters are circumstances to be considered along with other facts." 77 N.D. at 12, 39 N.W.2d at 437.

Applying this standard, the court focused on the relationship between the son and the members of the father's family. Because the son had "severed his relationship with members of the household [of the father] some three years prior to the accident," had "maintained his own home and was no longer a member of the family group," the court declined to hold the father liable for the son's negligent operation of the vehicle. 77 N.D. at 13–14, 39 N.W.2d at 437–438.

The *Bryan* application of the "family car" doctrine reveals that Terrance's argument is too narrow. Consistent with the agency basis of the doctrine, the totality of circumstances surrounding the relationship between Eric and members of the Terrance's family determines whether or not Eric was a member of the family for purposes of the doctrine. While the maintenance of a single physical abode is important, it is but one indicium of family membership.

Other courts, when faced with this problem, have adopted an analytic approach akin to that used by this court in *Bryan*, *supra*. See, e. g., *Platt v. Gould*, 26 Ariz. App. 315, 548 P.2d 28 (1976)—doctrine inapplicable because the daughter had reached her majority, had moved from the family home in New Mexico to her own home in Arizona, and was generally self-sufficient; *Alexander v. Kendrick*, 134 Ga.App. 249, 213 S.E.2d 911 (1975)—despite divorce between the father and the mother, with custody of their daughter awarded to the mother, and their maintenance of separate physical abodes with their daughter residing with the mother, doctrine applicable to

hold father liable because he admitted that he was the head of household; *White v. Vananda*, 13 N.C.App. 19, 185 S.E.2d 247 (1971)—doctrine applicable even though son was in the military and resided away from home; *Calhoun v. Eaves, supra*—doctrine inapplicable for various reasons, one of which was the son's residence away from home at the time of accident; *Dunn v. Caylor*, 218 Ga. 256, 127 S.E.2d 367 (1962)—doctrine applicable even though the son was in military; *McGinn v. Kimmel*, 36 Wash.2d 786, 221 P.2d 467 (1950)—doctrine inapplicable because the son had left the family circle and established a home of his own. Although not reaching identical results, the courts in these cases looked beyond the important but not dispositive factor of maintenance of separate physical abodes and delved into the relationship between the operator of the vehicle and members of the family of the alleged head of the household. The determinative factor implicit in these cases was whether or not the operator of the vehicle had severed his or her relationship with the family of the head of the household so as to terminate the fictitious agency relationship upon which the "family car" doctrine is premised. We use this test to decide the issue of family membership in the case at bar.

The facts relevant to this issue are not in dispute. Eric was employed by Terrance's company. He lived in a trailer home owned by Terrance. He frequently visited and dined at Terrance's home. He often turned to Terrance for advice on personal matters. Yet the interaction between Eric and Terrance during working hours may be characterized as nothing more than that normally present in any employer-employee relationship. While Terrance owned the trailer home in which Eric lived, Eric and his two roommates, one of whom was not related to Terrance and Eric and clearly was not a member of Terrance's family, paid the trailer lot rent and utility expenses that they incurred. Nothing in the material submitted to the district court in regard to the motion for summary judgment establishes that Eric and his roommates rented the

trailer home at a rental rate substantially below the reasonable rental value of the property. Finally, Eric's presence at Terrance's home and reliance on his counsel demonstrates only that Eric and Terrance maintained a normal father-son relationship. In view of these undisputed facts, the only possible inference is that, for purposes of the "family car" doctrine, Eric was not a member of Terrance's family, and there was no genuine issue as to a material fact.

Although we believe a genuine issue of fact might exist as to the furnishing element of the "family car" doctrine, there is no such issue or inference as to the family membership element. Because both elements are necessary for application of the "family car" doctrine, summary judgment was proper.

We recognize that Herman wields a significant weapon—the sword of public policy represented by the "family car" doctrine. With this sword in hand, we might be inclined to whittle away at the facts of this case in an effort to make the doctrine applicable. Yet, when confronted with an equally important concern—encouragement and strengthening of normal familial bonds—we find that this sword is blunted. We decline to extend the "family car" doctrine in a manner that would discourage normal, desirable interaction between family members who have severed, for purposes of the doctrine, the fictitious agency relationship that formerly existed between them.

The judgment of the trial court in favor of Terrance is affirmed.

ERICKSTAD, C. J., and PEDERSON, PAULSON and SAND, JJ., concur.