**Randolph NODLAND and Ileene Nodland, Plaintiffs and Appellees,**

v.

**PLAINSMEN PETROLEUM, INC., a North Dakota Corporation, Natural Gas Pipeline Company of America, a corporation, and the Nokota Company, formerly Star Drilling, Inc., a North Dakota Corporation, Defendants and Appellants.**

**Civ. No. 9409.**

Supreme Court of North Dakota.

April 13, 1978.

Mackoff, Kellogg, Kirby & Kloster, Dickinson, for defendants and appellants; argued by John L. Sherman, Dickinson.

Freed, Dynes, Malloy & Reichert, Dickinson, and Lundberg, Conmy, Nodland, Rosenberg, Lucas & Schulz, Bismarck, for plaintiffs and appellees; argued by Ronald A. Reichert, Dickinson.

PEDERSON, Justice.

This is an appeal from a decision ordering the rescission of a contract (lease) by which Nodland conveyed to Plainsmen Petroleum, Inc., (hereinafter Plainsmen) a leasehold interest in the coal reserves underlying certain lands in Dunn County, North Dakota. The case was tried to the court without a jury. We reverse.

The facts, essentially as they were found by the trial court, are as follows:

In September 1971, Charles W. Skjod, an agent of Plainsmen, appeared at the Nodland farmstead and solicited a coal lease. Nodland informed Skjod that he was not interested in leasing as he didn't own the coal under his land, the minerals having been reserved by previous owners. Skjod then advised Nodland that coal rights and mineral rights are two separate things, and that if coal is not specifically reserved it is not covered by a mineral reservation. In addition, Skjod said that coal is not a mineral but is a vegetable or organic substance. A well driller's log showed twenty-three feet of coal under the Nodland farmstead. Both Nodland and Skjod knew of the log. Nodland told Skjod that he was going to

check into his coal ownership before deciding whether to enter into a lease. Skjod then left the farmstead, after leaving a copy of a document entitled "Coal Lease." This document was very similar to the lease eventually entered into.

Nodland thereafter conducted an investigation into the matter of mineral reservations, including coal. He talked with his neighbors and went to the Dunn County Register of Deeds' office in Manning where, according to his testimony, he was told by the Deputy Register of Deeds that, according to the records, minerals had been reserved on his land but that no record could be found indicating that coal had been specifically reserved.

On October 6, 1971, Skjod returned to the Nodland farmstead. The value of coal was discussed with reference to a 23-foot thick vein, and a leasehold interest reckoned at ten cents per ton. The return to Nodland for leasing of the coal was computed to be $3,000 per acre. Nodland, at the time, estimated that his entire farm was worth close to $2,000,000, based upon the above assumptions.

The Nodlands signed a lease contemplating that they would be given ten cents per ton for all coal mined, while under the impression that they owned all of the coal under the surface area which they owned.

On December 17, 1974, Nodland was advised that the North Dakota Supreme Court, in *Christman v. Emineth,* 212 N.W.2d 543 (N.D.1973), had declared that a reservation of mineral rights reserved coal as well. At that point (December 1974), he became aware that not all that he had been told about mineral rights by Skjod was true.

In January and February of 1975, Nodland did not know what was required for rescission and took no steps to find out. He thought that there were some bills in the North Dakota Legislature which, if passed, would protect landowners. No protective legislation was enacted. In May of 1975, Nodland met with attorneys and was told that he had to return the lease money received to effect rescission. A notice of rescission was executed on July 31, 1975, and the lease money was paid into court on October 2, 1975, all pursuant to § 9–09–04, NDCC.

Some additional facts which were noted by the trial court included:

(1) Nodland's admission that Skjod had told him that the coal might be owned by the United States but that Skjod treated this reservation lightly;

(2) That Randolph and Ileene Nodland discussed the lease and decided that they would not sign it if they did not own the coal;

(3) That prior to the signing of the lease by the Nodlands, Skjod knew that coal was a mineral but that minerals did not necessarily include coal; and

(4) That the First Deputy Register of Deeds of Dunn County could not recall that Nodland had requested a search of the records.

The following transactions relate to the leasehold interest acquired from Nodland:

(1) On February 1, 1973, Plainsmen assigned all the interest it had in the Nodland lease to Star Drilling (hereinafter Star).[1]

(2) A document entitled "Coal Agreement for Coal Leases in Dunn County, North Dakota," was executed January 25, 1973, under which the Natural Gas Pipeline Company of America (hereinafter NGP) acquired certain rights in the Nodland lease from Star.[2]

(3) On December 28, 1976, NGP notified Nokota, by letter, of NGP's intention to exercise its option effective as of that date.

---

1. The successor to Star Drilling, Inc., is now known as The Nokota Company. Skjod was, at the time of the assignment, president of Star. Plainsmen and Star have offices in the same building and certain individuals appear as officers in both corporations.

2. The apparent discrepancy between the date on which Star acquired the leasehold and the date when it gave an option to NGP has not been argued as supporting Nodland's position.

Though Nokota, Star, Plainsmen and NGP question no specific finding of fact, they question the findings of fact generally, and assert that the trial court committed several errors in the legal conclusions which it drew from the facts. We reach but one of the alleged errors.

NGP asserted, as a defense, that it was a "purchaser in good faith and for valuable consideration." It is undisputed that, at the time NGP entered into its option agreement with Star, it had no notice of Nodland's claim. It is also undisputed that, at the time the option was exercised, NGP was fully apprised of Nodland's claim, having been served with a notice of rescission prior thereto. On January 31, 1973, NGP caused a properly acknowledged notice of its option agreement to be registered with the Dunn County Register of Deeds pursuant to §§ 47–19–01, 47–19–03 and 47–19–13, NDCC.

■■■ The general rule in this State, and in others, is that a good-faith purchaser for value will prevail if his grantor was possessed of voidable title. While a deed that is absolutely void passes no title, before a court of equity will declare a deed void as against the rights of an innocent purchaser, a fraud which goes to the execution of the instrument, rather than its inducement, must be proved. The proof must be clear, unequivocal and undiminished by negligence of the grantor. *Glascoe v. Bracksieck,* 85 N.W.2d 423 (N.D.1957); *Hoffer v. Crawford,* 65 N.W.2d 625 (N.D.1954); *Dixon v. Kaufman,* 79 N.D. 633, 58 N.W.2d 797 (1953). In the instant case, rescission is sought on grounds of mutual mistake. Fraud was pleaded initially by Nodland, but was not considered by the trial court because Nodland had "not complied with Rule 9(b) of the Civil Procedures and in the opening statement said it was not an issue." [3] While suggestions of fraud have crept into this appeal, the suggested fraud could have gone only to the inducement.

Under the law of this State it could not defeat the rights acquired by innocent purchasers. See, i. e., *Hoffer v. Crawford, supra.*

The key question thus becomes: Is NGP a good-faith purchaser for value of the leasehold interest in the coal underlying Nodland's property? The trial court apparently decided that NGP was not a good-faith purchaser. The following conclusion of law was made by the trial court:

"(H) That the recording statutes do not allow the assignee of a lease freedom from defenses the lessor may have against the lessee."

In a memorandum opinion the trial court cited the case of *C.I.T. Corporation v. Hetland,* 143 N.W.2d 94 (N.D.1966), for the assignment principles contained therein. The trial court acknowledged that *C.I.T. Corporation* was poor authority because it is premised on a statute (§ 51–07–09, NDCC) which deals with personal property. We have not heretofore extended, and are unwilling now to extend, the principles of *C.I.T. Corporation* to a real estate action and, particularly, to a real estate action involving the recording statutes.

■■ NGP asserts that it is a good-faith purchaser because, at the time the option was entered into, it had no notice, either actual or constructive, of Nodland's claim. It insists that the exercise of the option relates back to the earlier taking of the option. NGP quotes from the syllabus of an early North Dakota case:

"Upon acceptance in accordance with the terms of an option to purchase real estate, where the land covered thereby has been, pending acceptance and during the period stipulated within which acceptance might be made, transferred to a third party, with full notice of such option outstanding and unaccepted, the same may be accepted by notice of acceptance served upon the optionor, the owner, giving the option, and thereupon

---

**3.** "(b) *Fraud, Mistake, Condition of the Mind.* In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Rule 9(b), NDRCivP.

the rights of the acceptor, optionee, *relate back to and attach as of the date of the option,* and render the intervening rights acquired with notice subject to all rights of the option purchaser." Syllabus 5, *Horgan v. Russell,* 24 N.D. 490, 140 N.W. 99 (1913). [Emphasis added.]

Though the appellant has stated "we cannot overemphasize the far-reaching effect of the matters here to be decided or the chaos which would be created by allowing the trial court decision to stand," no cases have been cited wherein the contestants are the grantors of a leasehold interest and the holders of an unexercised, though duly recorded, option to purchase that leasehold interest. We agree that there are many cases which, like *Horgan v. Russell, supra,* pit two grantees of an interest in real estate against each other.[4] In such cases, the recording acts determine priorities. A properly recorded option creates valuable contract rights which courts will protect.

The doctrine of "relation back" is not a favorite with the law generally. 1 Williston on Contracts, 3d Ed., § 96. The law of real estate has often provided an exception. A series of cases concerns the prohibition on alienation of Indian lands without the permission of the President or his Secretary of the Interior. A period of time invariably elapsed between the sale and the grant of permission. On occasion, the interests of new parties were said to have sprung up between these two times. The United States Supreme Court applied the doctrine of relation back to invalidate interests arising after the sale, where the permission for the sale was eventually granted. *Pickering v. Lomax,* 145 U.S. 310, 12 S.Ct. 860, 36 L.Ed. 716 (1892); *Lykins v. McGrath,* 184 U.S. 169, 22 S.Ct. 450, 46 L.Ed. 485, 486 (1902); *Anchor Oil Co. v. Gray,* 256 U.S. 519, 41 S.Ct. 544, 65 L.Ed. 1070 (1921). In *Lykins,* the Supreme Court said:

> "The doctrine of relation may be only a legal fiction, but it is resorted to with the view of accomplishing justice."

What then would be the purpose of allowing NGP to relate its purchase (exercise of its option) of the leasehold interest back to the time it entered into its option? We think the vindication of the recording act requires it. Were we to hold otherwise, we would establish two classes of persons, each with different rights with respect to good-faith purchasers. The good-faith purchaser could then rely on the recording act in conflicts with those outside of his chain of title but could not rely on the recording act with regard to prior grantors in his chain of title. Such a result is absurd and would result in injustice. See, generally, *State v. Jelliff,* 251 N.W.2d 1, 7 (N.D.1977); *Pollock v. McKenzie County Public School Dist. # 1,* 221 N.W.2d 521, 527 (N.D.1974); *State v. Allesi,* 216 N.W.2d 805, 817 (N.D. 1974); *Perry v. Erling,* 132 N.W.2d 889, 896 (N.D.1965).

We conclude that the doctrine of relation back must be applied to this case. For the purposes of establishing NGP's priorities against the interest of Nodland, the date upon which NGP purchased its interest in the leasehold is January 31, 1973, the date of the filing of the instrument entitled "Notice of Rights in Coal Leases, Dunn County, North Dakota." We make this determination as a matter of law.

There being no assertion that NGP had either actual or constructive notice of Nodland's claim as of the above mentioned date, we hold, as a matter of law, that NGP is a good-faith purchaser for value of the disputed leasehold. It follows therefrom that Nodland was not entitled to the remedy of rescission as to the defendant NGP.

> "When one of two innocent persons must suffer by the act of a third, he by whose negligence it happened must be the sufferer." Section 31–11–05(34), NDCC.

The judgment is reversed.

---

4. See, i. e., *South Carolina Tax Commission v. Belk,* 225 S.E.2d 177 (S.C.1976); *La Marche v. Rosenblum,* 82 Misc.2d 1046, 371 N.Y.S.2d 843 (1975); *Strutt v. Ontario Savings and Loan Association,* 11 Cal.App.3d 547, 90 Cal.Rptr. 69 (1970); *Raub v. General Income Sponsors of Iowa, Inc.,* 176 N.W.2d 216 (Iowa 1970); *Love v. Fauquet,* 184 Neb. 250, 166 N.W.2d 742 (1969). See, also, early cases collected in the Annotation at 50 A.L.R. 1314.

ERICKSTAD, C. J., and PAULSON, SAND and VOGEL, JJ., concur.