Peter A. NYGAARD, Jr., and Lynette Nygaard, husband and wife, and Peter A. Nygaard, Jr., and Albert Ley, Co-Trustees of the Joan K. Walter Mineral Trust and the Mary Pauline Nygaard Mineral Trust, Plaintiffs and Appellees,

v.

D.G. ROBINSON and W.R. Barth, Defendants,

and

HNG Oil Company, Defendant and Appellant.

Civ. No. 10445.

Supreme Court of North Dakota.

Nov. 15, 1983.

Dwight C. Eiken of Bjella, Neff, Rathert, Wahl & Eiken, Williston, for plaintiffs and appellees.

Jane Fleck Romanov of Fleck, Mather, Strutz & Mayer, Bismarck, for defendant and appellant.

VANDE WALLE, Justice.

Defendant HNG Oil Company ("HNG") appealed from the judgment of the district court, McKenzie County, determining that plaintiffs Peter Nygaard, Jr., Lynette Nygaard, and the trustees of two mineral trusts ("Nygaards") were entitled as lessors to terminate, pursuant to Section 47–16–36, three mineral leases assigned to HNG. The district court held that HNG was not a bona fide purchaser of the assigned leases and that the Nygaards could cancel the leases because the lessees, defendants D.G. Robinson and W.R. Barth, failed to pay the bonus consideration. The district court awarded to the Nygaards statutory damages, costs, and reasonable attorney fees pursuant to Section 47–16–37, N.D.C.C. We affirm.

The following events involved three different sets of leases: a single lease covering 625 mineral acres, dated February 23,

1982; a set of three leases covering the same area, dated April 22, 1982, and acknowledged on the same date; and a set of three leases covering the same area, dated April 22, 1982, and acknowledged on April 28, 1982.

In February 1982 defendant Donald Robinson approached plaintiff Peter A. Nygaard, Jr. ("Nygaard") about leasing 625 mineral acres owned one-third by Nygaard and his wife, Lynette Nygaard, and two-thirds by two mineral trusts which were established for his sisters. Plaintiffs Nygaard and Albert Ley acted as co-trustees for the trusts. Robinson initially offered Nygaard $62,500 for the lease, which amounts to $100 per mineral acre. Nygaard rejected the offer.

On February 23, 1982, Nygaard signed a lease covering the 625 mineral acres. He did not give the original lease to Robinson because Robinson did not provide any bonus consideration. Nygaard instead gave Robinson a lease designated as a copy, knowing that Robinson would show the lease to oil and gas companies in order to assign the lease for profit. The bonus consideration specified in the original lease was $150,000, which amounts to $240 per mineral acre.

Robinson showed the lease to defendant Bill Barth, a landman. Robinson and Barth then contacted John Kane, the owner of Sage Oil & Gas Company. Kane and a former partner, Victor Stabio, a landman for Adobe Oil and Gas Company, decided to try to sell the lease by showing the copy to others. Barth offered the lease to Kane for $200 per mineral acre; Stabio offered it to others for $225 per mineral acre.

Stabio was dissatisfied with the numerous provisions crossed out in the lease and requested that Robinson and Barth obtain three new leases covering the same area with more favorable terms. On April 21, 1982, Robinson called Nygaard about the lease he received on February 23, 1982. The next day, April 22, 1982, the son of co-trustee Ley acknowledged the second set of three oil and gas leases executed by Nygaard.

Robinson and Barth brought the new leases to Stabio. Stabio still was dissatisfied with the leases, but hoped to sell revised leases to Charter Oil Corporation. Stabio prepared three new leases for Robinson and Barth to take to Nygaard for his signature. Robinson and Barth agreed to see Nygaard, but stated that they would need a cashier's check payable to Nygaard for $62,500, which amounts to $100 per mineral acre. Stabio gave them the leases and the cashier's check. Stabio asked Robinson and Barth to execute blank assignments to Sage Oil Company.

On April 26, 1982, Charter officials discussed the leases with HNG. The next day Charter called Stabio and informed him that HNG was willing to buy the leases for $171,875, which amounts to $275 per mineral acre. On that day HNG orally committed itself to purchase the leases, but subject to approval of the title and after review of the leases which still needed to be executed by Nygaard. On that same day Barth and Robinson then assigned the leases to Sage. On April 27, 1982, Sage assigned the leases to Charter, and Charter assigned the leases to HNG. HNG sent Charter a letter dated April 28, 1982, to confirm in writing its commitment to purchase the leases.

On April 28, 1982, Robinson visited Nygaard at his home in order to have Nygaard execute the three leases that Stabio had prepared. According to Nygaard, before he signed the leases, he received a call from Albert Metcalf, a landman for HNG. Metcalf asked Nygaard if he was offering to lease the land for $100 per mineral acre and if the land was already subject to a working interest agreement with another company. Nygaard told Metcalf that $100 per mineral acre was too low. He added that he had not executed any lease for the land and that he would be willing to deal directly with HNG for $240 per mineral acre. He also stated that HNG should question the person who indicated that the land could be leased for $100 per mineral acre. Metcalf declined on behalf of HNG to accept Nygaard's offer. To establish

the date of this conversation, Nygaard referred to his phone records which he made in the course of his business transactions.

Metcalf did not dispute the content of this conversation. Metcalf claimed, however, that this conversation occurred five or six days before April 28.

While Robinson was at Nygaard's home on April 28, Nygaard signed the leases. Robinson also gave Nygaard the $62,500 cashier's check drawn by Stabio and made payable to Nygaard. Robinson asked Nygaard to specially endorse the check, making it payable to Robinson. Robinson explained that he would use the endorsed cashier's check to supplement the funds expected from a partner. Robinson stated that with this check and the partner's funds he would be able to pay a 15-day sight draft in the amount of $150,000 as bonus consideration. Nygaard agreed to specially endorse the check and he then accepted the 15-day sight draft. HNG received the leases on the same day, April 28, 1982.

Two days later Stabio went to Williston to do a title search; the title to the leases required minor curative work. HNG tendered to Charter a 5-day sight draft for $171,875.

When the 15-day sight draft became due, the bank dishonored the draft. Before the dishonor, Robinson had informed Nygaard that the bank would dishonor the draft, and he had given Nygaard a check for $150,-000. This check was similarly dishonored. Robinson gave Nygaard a second check for $150,000, which the bank also dishonored. Nygaard called HNG, Stabio, Kane, and Barth, seeking payment of the bonus consideration.

Because he had not received any of the bonus consideration, Nygaard gave HNG statutory notice of termination and forfeiture of the leases on June 14, 1982, pursuant to Section 47–16–36, N.D.C.C. The trial court declared void the adverse claims of Robinson, Barth, and HNG, and it awarded to the Nygaards statutory damages, costs, and reasonable attorney fees in the amount of $9,757.06, pursuant to Section 47–16–37, N.D.C.C.

On appeal HNG raises three issues. First, it contends that the trial court erred in holding that HNG was not a bona fide purchaser for value without notice when it purchased the leases from Charter, its assignor. Second, HNG maintains that because Section 47–16–37, N.D.C.C., allows a trial court to award statutory damages, costs, and reasonable attorney fees to a prevailing lessor and not to a prevailing lessee, Section 47–16–37 violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Sections 21 and 22 of Article I of the North Dakota Constitution. Finally, HNG argues, in the alternative, that even if Section 47–16–37 is not unconstitutional, the trial court abused its discretion in awarding statutory damages, costs, and attorney fees to the Nygaards.

I

Before considering the first issue we discuss HNG's contention that this court has broad discretion in reviewing whether or not the trial court erred in holding that HNG was not a bona fide purchaser for value without notice, and that the standard of Rule 52(a), N.D.R.Civ.P., is not the appropriate standard of review.

In *Earth Builders, Inc. v. State, Etc.*, 325 N.W.2d 258, 259 (N.D.1982), we stated that the determination of whether or not an individual leased property in good faith without notice was "a mixed question of fact and law" fully reviewable "without the strictures imposed by Rule 52(a), N.D. R.Civ.P." Although a broad interpretation of *Earth Builders* would suggest that this court uses a de novo standard of review when examining the issue of a bona fide purchaser for value without notice, we emphasize that the issue presents *mixed* questions of fact and law.

In *E.E.E., Inc. v. Hanson*, 318 N.W.2d 101, 104 (N.D.1982), we distinguised between findings of fact and conclusions of law:

"Findings of fact are the realities as disclosed by the evidence as distinguished from their legal effect or consequences. Where the ultimate conclusion can be arrived at only by applying rules of law the result is a 'conclusion of law.' "

See also *Slope Cty., Etc. v. Consolidation Coal Co.*, 277 N.W.2d 124 (N.D.1979). A finding of fact is reached by natural reasoning, and a conclusion of law is reached by fixed rules of law. *Northern States Power Co. v. Hagen*, 314 N.W.2d 278 (N.D. 1982).

██ In distinguishing between a finding of fact and a conclusion of law, this court also considers whether or not events are undisputed. In *Slope Cty., Etc. v. Consolidation Coal Co.*, 277 N.W.2d at 127, we stated:

"[I]f facts are undisputed and only one, if any, inference can reasonably be drawn from the facts, the determination of that inference is a question of law. When, however, facts are not in dispute but permit the drawing of different inferences, the drawing of one such permissible inference is said to be a finding of fact."

See also *Fettig v. Whitman*, 285 N.W.2d 517 (N.D.1979).

In the present case certain facts are in dispute. Metcalf, landman for HNG, testified that on April 21 or 22, he called Nygaard. Metcalf stated that the sole purpose for his call was to discover if Nygaard's land was subject to the interest of another oil company. Metcalf testified that Nygaard not only said that he had not even signed any leases, but also that he was willing to deal directly with HNG for a price of $240 per mineral acre. Metcalf did not remember if Nygaard had told him to check the acreage of the lease someone was trying to sell to HNG for $100 per mineral acre. Metcalf stated that this was his only call to Nygaard. According to Nygaard, this conversation occurred on April 28. He stated that he remembered the date because he received the call moments before he executed the leases.

██ The trial court determined that the disputed event occurred on April 28, 1982. The trial court's decision with respect to the date of the telephone call is a finding of fact subject to Rule 52(a) because it is reasonably inferred from the evidence. See *Slope Cty., Etc. v. Consolidation Coal Co., supra.* The trial court had before it conflicting evidence from which it could conclude that Nygaard's testimony was more logical than Metcalf's testimony. The trial court could reasonably conclude that Metcalf did not cogently explain why he failed to call Nygaard back if the call had actually occurred on April 21 or 22, five or six days before he orally agreed to purchase the leases for $271 per mineral acre. Instead of dealing directly with Nygaard, he agreed to pay an extra $30 per mineral acre. In addition, the trial court evaluated the demeanor of these witnesses. Because we are not left with a definite and firm conviction that a mistake has been made, we do not believe that this finding of fact is clearly erroneous. *E.E.E., Inc. v. Hanson, supra.*

██ The trial court's ultimate determination that HNG was not a bona fide purchaser for value, however, is a conclusion of law because such a determination describes the legal effect of the realities—the findings of fact—ascertained by the trial court. See *Slope Cty., etc. v. Consolidation Coal Co., supra.* In this case the findings of fact relate to the events surrounding HNG's purchase, and the conclusions of law indicate whether these events, when considered in toto, signify that HNG failed to prove that it was a good-faith purchaser for value without notice. A conclusion of law, unlike a finding of fact, is fully reviewable. *E.E.E., Inc. v. Hanson, supra.* The issue of HNG's status as a good-faith purchaser without notice is thus a mixed question of fact and law.

██ HNG contends that the trial court erred in holding that HNG was not a bona fide purchaser for value without notice when it purchased the leases from Charter. In *Nodland v. Plainsmen Petro-*

*leum, Inc.*, 265 N.W.2d 252, 255 (N.D. 1978), we stated that "[t]he general rule in this State, and in others, is that a good-faith purchaser for value will prevail if his grantor was possessed of voidable title." The title is void if there was fraud in the execution and is voidable if there was fraud in the inducement. *Nodland v. Plainsmen Petroleum, Inc., supra; Hoffer v. Crawford*, 65 N.W.2d 625 (N.D.1954); *Dixon v. Kaufman*, 79 N.D. 633, 58 N.W.2d 797 (1953). In the present case, the trial court determined that Robinson and Barth defrauded the Nygaards. Because the Nygaards knew that they were signing oil and gas leases and because they were mentally competent at the time of execution, the fraud occurred when Robinson and Barth induced the Nygaards to lease their land. See *Hoffer v. Crawford, supra*. Because the Nygaards were possessed of voidable title, HNG, to prevail, must be a good-faith purchaser for value without notice.

 HNG paid value for the leases when it gave Charter $171,875 for the leases. The issue is thus whether or not HNG purchased the leases without notice in good faith. HNG did not have actual notice that Robinson and Barth planned to defraud the Nygaards by failing to pay them the promised $150,000 as consideration. But HNG did have constructive notice imputed by law. Section 1–01–24, N.D.C.C. Section 1–01–25 specifies what constitutes constructive notice, and Section 1–01–21 defines "good faith":

"1–01–25. *What deemed constructive notice.*—Every person who has actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact and who omits to make such inquiry with reasonable diligence is deemed to have constructive notice of the fact itself."

"1–01–21. *Good faith—Definition.*—Good faith shall consist in an honest intention to abstain from taking any unconscientious advantage of another even through the forms or technicalities of law, together with an absence of all in-

formation or belief of facts which would render the transaction unconscientious." The issue of good faith is similar to the issue of constructive notice in that both issues require an examination of the information possessed by a person. The issue of a purchaser's knowledge entails an examination of the circumstances in each case to determine if the information the purchaser received constituted notice or created a duty to inquire. See, e.g., *Burlington Northern, Inc. v. Hall*, 322 N.W.2d 233 (N.D.1982); *City of Bismarck v. Casey*, 77 N.D. 295, 43 N.W.2d 372 (1950); *Agricultural Credit Corp. v. State*, 74 N.D. 71, 20 N.W.2d 78 (1945); *Pierce Tp. of Barnes County v. Ernie*, 74 N.D. 16, 19 N.W.2d 755 (1945); *Doran v. Dazey*, 5 N.D. 167, 64 N.W. 1023 (1895).

In the present case, the trial court found that HNG, for its claim to title, had relied solely upon the third set of leases, the leases dated April 22, 1982, and acknowledged on April 28, 1982. The parties themselves stipulated that on April 26, 1982, Robinson and Barth assigned their interest to Sage and that on April 27, 1982, Sage assigned its interest to Charter, and Charter assigned its interest to HNG. Metcalf testified that on April 27, 1982, he verbally agreed to purchase the leases from Charter and that on April 28 he confirmed the agreement in writing by sending Charter a letter. Metcalf admitted that the leasing transaction involved pre-sold leases because HNG agreed to purchase the leases before Nygaard had executed them. At trial he explained that HNG does not require from its assignor proof that the lessor received its bonus consideration for leasing because it presumes that the money it gives its assignor will be used to pay off any intermediaries and the lessor himself. The trial court found that HNG was aware, or should have been aware, that the transaction involved pre-sold leases.

 The trial court's determination that HNG knew, or should have known, that it was purchasing pre-sold leases does not of itself signify that HNG was not a bona fide purchaser in good faith and without notice.

Metcalf stated that long before Charter had offered to sell the leases to HNG for $171,875, he received a call from Randy Lassiter, who offered to sell the leases for $62,500. When Metcalf called Nygaard on April 28, he not only learned that the leases had not been executed, that is, that HNG had agreed to purchase pre-sold leases, but also that Nygaard wanted to deal directly with HNG. Nygaard also advised Metcalf to investigate its exact interest.

HNG contends that such information does not signify that it was not a bona fide purchaser in good faith without notice. Metcalf admitted that he never attempted to call either Nygaard or Lassiter after speaking with them. HNG argues that the circumstances did not warrant further inquiry, and, if they did, HNG would not have acquired any information that could have revealed Robinson and Barth's fraudulent actions.

■ Section 1–01–25 specifies that there is a duty to inquire when circumstances are "sufficient to put a prudent man upon inquiry." See *Putnam v. Dickinson*, 142 N.W.2d 111 (N.D.1966). In *Stone v. Bartsch*, 76 N.D. 721, 39 N.W.2d 1, 6 (1949), this court discussed the circumstances that signify that a subsequent purchaser acquires constructive notice of another person's interest, quoting with approval *Wahl v. Stoy*, 72 N.J.Eq. 607, 614, 66 A. 176, 179 (1907):

> "The information need not be so full and detailed as to communicate a complete description of the opposing interest. It is sufficient if it asserts the existence of a right or interest as a fact.... *It need not state all the particulars or impart complete knowledge.* It is enough if he has reasonable ground to believe that a conflicting right exists as a fact." [Emphasis supplied.]

To have constructive notice of the fraudulent transaction, HNG thus did not need to know the exact details of Robinson and Barth's conduct. The circumstances needed only to give rise to a duty to investigate.

■ In making the inquiry a person needs to act with only "reasonable diligence." *Gerhardt Const. Co. v. Wachter Real Estate Trust*, 306 N.W.2d 223, 226 (N.D.1981). A "superficial inquiry" is not adequate. *Earth Builders, Inc. v. State, Etc.*, 325 N.W.2d at 260. Even if HNG in good faith did not appreciate its duty to inquire, "it is the performance of the duty and not the understanding of it or lack thereof that determines the rights of parties." *Pierce Tp. of Barnes County v. Ernie*, 74 N.D. at 28, 19 N.W.2d at 760. In the present case HNG argues that even if it had called Stabio, an intermediary, or Nygaard himself, it would not have acquired sufficient information that would have caused HNG to require proof of the bonus payment.

If HNG had called Stabio, it would have discovered that Nygaard had received a cashier's check for $62,500. Although such knowledge may at first suggest that Nygaard had received the bonus consideration, this knowledge would have clearly contradicted the information Nygaard imparted to Metcalf during their phone conversation of April 28. Metcalf knew that Nygaard had refused to lease the land for $62,500 and had asked for $150,000.

■ If HNG had called Nygaard, it would have discovered that Nygaard had received a 15-day sight draft for $150,000. HNG argues that this information would fail to put it on notice. In arguing that Nygaard's acceptance of a sight draft would suggest to HNG that the Nygaards had received payment, HNG views the tendering of a sight draft as the tendering of cash. Professor Quinn, however, in his treatise on the Uniform Commercial Code, states:

> "The [personal] check ... is supposed to serve the same function as money. It does—with one enormous difference: The check takes time to clear, and it may bounce.... [A]cceptance of the check as payment is conditioned on its clearance." T. Quinn, *Uniform Commercial Code Commentary and Law Digest* § 3–140 (Supp.1983). See Sec. 41–03–76, N.D.C.C. [U.C.C. 3–802].

Even before the Uniform Commercial Code was first promulgated, this court stated, "Payment by check is generally held conditioned upon the check's being honored unless there is a special agreement to the contrary." *Sjoberg v. State Auto. Ins. Assn. of Des Moines, Iowa*, 78 N.D. 179, 186, 48 N.W.2d 452, 455 (1951). After the payee presents a sight draft, the payor bank indicates by its actions when final payment occurs. Sec. 41–04–23, N.D.C.C. [U.C.C. 4–213]. We do not believe the sight draft can be considered payment. Thus, if HNG had called Nygaard, it would have discovered that Nygaard had received a 15-day sight draft. This information could have indicated that the Nygaards had not been *paid* the bonus consideration.

 Although both Metcalf and Stabio testified that their companies do not require proof of the bonus payment when purchasing pre-sold leases, there are special circumstances in the present case. Metcalf's call to Nygaard and his call from Lassiter imparted enough knowledge to HNG to create a duty to ascertain whether or not Nygaard had been paid the bonus consideration. Therefore, HNG is not a good-faith purchaser for value without notice.

 HNG contends, however, that the Nygaards should not be allowed to cancel the leases because of their alleged negligence. HNG argues that three facts indicate Nygaard's negligence: Nygaard is well educated and has experience in handling oil and gas business transactions; Nygaard admitted that endorsing the $62,500 cashier's check to Robinson was risky, as signified by his futile attempt to endorse it restrictively by adding Robinson's account number after Robinson's name; and Nygaard knew that shortly before he endorsed the cashier's check for $62,500

someone was attempting to sell the leases for $62,500.

HNG argues that even when fraud occurs in the execution of a deed this court will not protect a negligent grantor. See *Hoffer v. Crawford, supra; Dixon v. Kaufman, supra.* In *Hoffer* we stated:

"[A] loss resulting to parties ignorant and innocent of fraud perpetrated by a third party, must fall on the one whose lack of care made fraud possible rather than upon one wholly unconnected with the fraudulent transaction." 65 N.W.2d at 626, Syllabus ¶ 5.

In the present case HNG could have prevented Nygaard's loss of $150,000 by requiring proof that the bonus consideration had been paid before it gave Charter $171,875. HNG also is not "wholly unconnected with the fraudulent transaction." Considering the nature of Nygaard's allegedly negligent actions and HNG's actions and inaction, we agree with the trial court that the Nygaards should not be estopped from asserting that the oil and gas leases are invalid.

## II

HNG argues that because Section 47–16–37, N.D.C.C., allows a trial court to award statutory damages, costs, and reasonable attorney fees to a prevailing lessor and not to a prevailing lessee, Section 47–16–37 violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Sections 21 and 22 of Article I of the North Dakota Constitution.[1]

Section 47–16–37 provides, in part:

"47–16–37. *Action to obtain release —Damages, costs and attorney's fees— Attachment.*—Should the owner of such lease neglect or refuse to execute a release, then the owner of the leased prem-

---

**1.** Section 21 states:

"No special privileges or immunities shall ever be granted which may not be altered, revoked or repealed by the legislative assembly; nor shall any citizen or class of citizens be granted privileges or immunities which upon the same terms shall not be granted to all citizens." N.D. Const., Art. I, § 21.

Section 22 provides that "[a]ll laws of a general nature shall have a uniform operation." N.D. Const., Art. I, § 22. Because this provision is similar to the principles applying to the Fourteenth Amendment, the court has considered the two provisions together. See *State v. Knoefler*, 279 N.W.2d 658 (N.D.1979).

ises may sue in any court of competent jurisdiction to obtain such release, and he may also recover in such action of the lessee, his successors or assigns, the sum of one hundred dollars as damages, and all costs, together with a reasonable attorney's fee for preparing and prosecuting the suit, and he may also recover any additional damages that the evidence in the case will warrant."

The need for a lessee to reimburse a lessor under Section 47–16–37 occurs when the lessee refuses or neglects to release the lease pursuant to Section 47–16–36, which specifies a procedure in which recorded oil, gas, and other mineral leases can be removed from the record by the lessor without a judicial determination.[2] See Sec. 47–16–36, N.D.C.C.

To determine the constitutionality of Section 47–16–37, this court must first ascertain the appropriate standard of review. We have previously discussed the three standards of review relevant to the Federal Constitution and to our State Constitution. See, e.g., *Herman v. Magnuson*, 277 N.W.2d 445 (N.D.1979); *State v. Knoefler*, 279 N.W.2d 658 (N.D.1979); *Johnson v. Hassett*, 217 N.W.2d 771 (N.D.1974). When a fundamental right or an inherently suspect classification is involved, courts have required strict judicial scrutiny under which a statute will be held invalid unless it is shown that the statute promotes a compelling governmental interest and that the distinctions drawn by the statute are necessary to further the purpose of the statute. See, e.g., *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *State ex rel. Olson v. Maxwell*, 259 N.W.2d

621 (N.D.1977). The intermediate standard of review requires a close correspondence between statutory classifications and legislative goals. See, e.g., *Patch v. Sebelius*, 320 N.W.2d 511 (N.D.1982); *Arneson v. Olson*, 270 N.W.2d 125 (N.D.1978). This court has applied the intermediate standard of review when determining the constitutionality of the Medical Malpractice Act [*Arneson v. Olson, supra*], of a guest statute [*Johnson v. Hassett, supra*], of a notice requirement applicable in actions against municipalities [*Herman v. Magnuson, supra*], and of a statute conditioning a tort victim's right to recover from the State upon the State's purchase of liability insurance [*Patch v. Sebelius, supra*].

When statutes govern the rights of parties with respect to business and commercial affairs, courts have applied the rational-basis test. See, e.g., *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); *Snyder's Drug St., Inc. v. North Dakota St. Bd. of Ph.*, 219 N.W.2d 140 (N.D.1974). In *Hall GMC, Inc. v. Crane Carrier Co.*, 332 N.W.2d 54, 61 (N.D.1983), we quoted with approval *State v. Knoefler*, 279 N.W.2d at 662:

"It is now settled that states have power to legislate against what are found to be *injurious practices in their internal and commercial and business affairs* as long as their laws do not run afoul of some specific federal constitutional prohibition or some valid federal law. In determining the constitutionality of statutes regulating commercial affairs under the Equal Protection Clause, courts have required only a rational relationship be-

---

**2.** In *Taurus Corp. v. Roman Yourk Equity Pure Trust*, 264 N.W.2d 688, 689 (N.D.1978), we summarized the procedure outlined in Section 47–16–36:

"Section 47–16–36, N.D.C.C., requires that the lessor serve the lessee with a notice substantially in the form set out in the statute. The lessee then has a period of time in which to give notice in writing to the register of deeds of the county where the real property is located that the lease has not been forfeited. If the lessee complies with the statute and gives the proper notice, the lessor is entitled to the remedies provided by law to cancel the dis-

puted lease. If, on the other hand, the lessee does not give the notice within the required time, the lessor can file with the register of deeds an affidavit setting out the facts required by the statute. This affidavit is then recorded by the register of deeds and thereafter the record of the lease will not be notice to the public of the existence of the lease. The record of the lease then also cannot be received in evidence in any court of this state on behalf of the lessee, his successors or assigns against the lessor, his successors or assigns."

tween the classification and the purpose of the statute." [Emphasis supplied.]

■ Because Section 47–16–36 is concerned with injurious business or commercial practices, this court will apply the rational-basis test to determine the constitutionality of Section 47–16–37. See *Schroeder Aviation, Inc. v. DeFehr*, 283 N.W.2d 147 (N.D.1979); *Tharaldson v. Unsatisfied Judgment Fund*, 225 N.W.2d 39 (N.D. 1974).

■ The burden is on the challenger to establish "that the classification bears no reasonable relation to a conceivable legislative purpose." *Newman Signs, Inc. v. Hjelle*, 268 N.W.2d 741, 758 (N.D.1978). See also *State v. Knoefler, supra.* "State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality." *McGowan v. Maryland, supra*, 366 U.S. at 425–426, 81 S.Ct. at 1105, 6 L.Ed.2d at 399. See also *Patch v. Sebelius, supra; Schroeder Aviation, Inc. v. DeFehr, supra; Snyder's Drug St., Inc. v. North Dakota St. Bd. of Ph., supra.* State legislatures also possess broad discretion in enacting laws which affect some group of citizens differently from others. See, e.g., *McGowan v. Maryland, supra; Snyder's Drug St., Inc. v. North Dakota St. Bd. of Ph., supra; Tharaldson v. Unsatisfied Judgment Fund, supra.*

The purpose of Section 47–16–36 was articulated by this court in *Taurus Corp. v. Roman Yourk Equity Pure Trust*, 264 N.W.2d 688, 693 (N.D.1978):

> "The legislature in enacting Section 47–16–36, N.D.C.C., attempted to establish a simple method in which landowners could remove a cloud from their title without the necessity of going into court. If the lessee disputes the termination or forfeiture of the lease, the lessee may force the lessor to secure a judicial determination of the issue by giving notice to the register of deeds within the required time."

In considering the simple procedure outlined in Section 47–16–36 for clearing land titles, we believe that the Legislature in enacting Section 47–16–37 provided motivation for a lessee to release a lease on lands containing oil, gas, or other minerals. HNG argues that to award statutory damages, costs, and attorney fees only to lessors is to punish lessees. But the award is not mandatory; the trial court had discretion under Section 47–16–37 in determining if a particular case warrants the awarding of attorney fees to a prevailing lessor.

HNG argues that Section 47–16–37 gives lessors unfair bargaining power because if lessees fail to release their leases they may be forced to reimburse the lessors for expenses incurred in litigation. Yet the award of attorney fees is proper under certain circumstances, that is, if the award does not give a party "an unfair advantage in the context." *Hoge v. Burleigh Cty. Water Management Dist.*, 311 N.W.2d 23, 31 (N.D.1981), quoting *Baldus v. Mattern*, 93 N.W.2d 144, 149 (N.D.1958). In enacting Section 47–16–37 the Legislature may have attempted to equalize the bargaining power of lessors and lessees. For example, if lessors lease only a few acres they may be reluctant to obtain a judicial determination of cancellation because the cost of litigation may outweigh the value of the leases. Lessees would therefore be in a superior bargaining position. And if lessors act in bad faith or make frivolous claims for relief lessees may receive attorney fees. See Section 28–26–31 and Section 28–26–01, N.D.C.C.

HNG also argues that the Legislature has failed to deem appropriate the award of attorney fees in similar contexts, such as when a buyer seeks specific performance for delivery of a warranty deed or a seller must foreclose against a defaulting buyer. See Chapter 32–19, N.D.C.C. In *Tharaldson v. Unsatisfied Judgment Fund, supra*, 225 N.W.2d at 41, syllabus ¶ 11, we stated:

> "The problem of legislative classification admits of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Reform may take one step at a time, addressing itself

to the phase of the problem which seems most acute to the legislative mind."

See also *Snyder's Drug St., Inc. v. North Dakota St. Bd. of Ph., supra.*

Because the classification created by Section 47–16–37 is not arbitrary and because there exists a state of facts which reasonably can be conceived to sustain the statute, we hold that the statute does not violate the Equal Protection Clause of the Fourteenth Amendment of the Federal Constitution nor Sections 21 and 22 of Article I of the North Dakota Constitution.

### III

Finally, HNG argues that the trial court abused its discretion in awarding statutory damages, costs, and attorney fees in the amount of $9,757.06 to the Nygaards. The general rule is each party pays its own attorney fees unless there is evidence of bad faith in pursuing litigation, of unjust enrichment, of a specific agreement, or there is statutory authorization. *Winkler v. Gilmore & Tatge Mfg. Co., Inc.*, 334 N.W.2d 837 (N.D.1983). Section 47–16–37 authorizes the award of statutory damages, costs, and reasonable attorney fees, and the language of the statute indicates that the award is subject to the discretion of the trial court. On appeal we determine only if the trial court has abused its discretion.

An abuse of discretion is defined as "an unreasonable, arbitrary, or unconscionable attitude on the part of the trial court." *Moser v. Wilhelm*, 300 N.W.2d 840 (N.D.1980). See also *Wall v. Penn. Life Ins. Co.*, 274 N.W.2d 208 (N.D. 1979); *Piper v. Piper*, 239 N.W.2d 1 (N.D. 1976). An abuse of discretion by the trial court never is assumed and must be affirmatively established. *Suburban Sales & Service, Inc. v. White*, 326 N.W.2d 873 (N.D.1982); *Klitzke v. Klitzke*, 308 N.W.2d 385 (N.D.1981). The trial court is considered an expert in determining the value of reasonable attorney fees and it may consider its own knowledge and experience in making an appraisal of the reasonable value of services rendered. *Matter of Es-*

*tates of Kjorvestad*, 287 N.W.2d 465 (N.D. 1980); *Morton County Board of Park Com'rs v. Wetsch*, 142 N.W.2d 751 (N.D. 1966).

In the present case when HNG tendered its sight draft for $171,785, it should have known that the Nygaards had not been paid their bonus consideration. Thereafter, the Nygaards did call HNG about the failure to receive the bonus consideration. HNG nevertheless refused to release the three leases that the Nygaards had executed. Under the circumstances of the present case, we do not find that the trial court abused its discretion in awarding to the Nygaards statutory damages, costs, and reasonable attorney fees.

We therefore affirm the judgment of the district court.

ERICKSTAD, C.J., and SAND and GIERKE, JJ., concur.

PEDERSON, Justice, concurring in part and dissenting in part.

Because, it appears to me, Nygaard and HNG equally disregarded standards of conduct expected of sophisticated businessmen dealing in real estate law, I concur in the results reached by Justice VandeWalle to the extent that the determination of the trial court is sustained, except for the award of statutory damages, costs and attorney fees. When the scales of justice are substantially in balance, it is an abuse of discretion to reward one side and punish the other with attorney fees and the like.